**2019 UT App 190**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRYANT ROBERT MITCHELL,
Appellant.

Opinion
No. 20180508-CA
Filed November 21, 2019

Second District Court, Ogden Department
The Honorable Joseph M. Bean
No. 171901633

Emily Adams and Cherise Bacalski, Attorneys
for Appellant

Sean D. Reyes and Jonathan S. Bauer, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1    A police officer frisked Bryant Robert Mitchell following a traffic stop, and found him in possession of drugs and a knife. The district court denied Mitchell's motion to suppress the evidence discovered as a result of the pat-down, and Mitchell appeals. We affirm, because we conclude that the officer reasonably suspected that Mitchell might be armed and dangerous.

BACKGROUND

¶2     While on patrol in an unmarked car in Ogden, Utah, police officers noticed a 1982 Chevy Blazer—with no roof and three passengers—make two turns without signaling. The officers began following the Blazer and, by checking its license plate number in their database, discovered that the vehicle was uninsured. The officers decided to make a traffic stop.

¶3     Just then, the Blazer turned into the parking lot of a convenience store, and the officers followed, but before they activated their red and blue lights, they saw and heard the shirtless front-seat passenger of the Blazer—a man who turned out to be Mitchell—stand up in his seat and yell the following words at a man walking through the convenience store's parking lot: "Come here, you mother fucker[!]" Officers later testified that Mitchell looked "very upset" and "aggressive," and that he began to open the door of the Blazer before it had come to a stop. One of them testified that Mitchell's screaming sounded indicative of an intent to "get into a confrontation or a fight with the person that he was talking to." After observing Mitchell's profane salutation, they pulled in behind the Blazer and activated their red and blue lights.

¶4     One of the officers immediately recognized the shirtless passenger as Mitchell, a person the officer already knew to be a felon and member of the Soldiers of Aryan Culture (SAC), a violent white supremacist gang.[1] The officer was able to

_____

1. The officers testified at the suppression hearing that SAC is a white supremacist gang, but did not specifically discuss whether SAC has a reputation for violence. In this case, however, we may take judicial notice that SAC is a violent gang. *See* Utah R. Evid. 201(b) (allowing courts to take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Other courts have already

(continued…)

recognize Mitchell quickly, because he had interacted with Mitchell on multiple prior occasions, including during a different drug investigation, and had thereby learned of Mitchell's gang affiliation, later testifying that Mitchell was "pretty forthcoming about his involvement in" SAC. Moreover, during the incident in question, Mitchell was wearing only a pair of shorts, and was readily identifiable from his numerous tattoos, which covered his head, face, and torso. Among other tattoos, Mitchell had the SAC patch—a swastika wrapped around an iron cross—tattooed on the back of his head, behind his right ear; a large "88"—a reference to "Heil Hitler," given that "H" is the eighth letter of the alphabet—tattooed on his stomach; the number "187"—a reference to the California Penal Code section for murder[2]—tattooed under his left eye; and, finally, his SAC moniker—"Lowdown"—tattooed on both his forehead and torso.

¶5 After approaching the vehicle, and asking the three occupants some initial identifying questions, one of the officers asked the driver for his consent to search the Blazer, and the

---

(…continued)

noted that SAC is a violent gang, *see, e.g., United States v. Dorton*, No. 2:08CR158 DAK, 2008 WL 4912052, at *2 (D. Utah Nov. 14, 2008) (referring to SAC as "a violent white supremacist gang"); *see also United States v. Fackrell*, 368 F. Supp. 3d 1010, 1017 (E.D. Tex. 2018) (allowing prosecutors to present evidence, at the sentencing phase, that the defendant was a SAC member and that SAC is a violent gang that "endorses the killing of members perceived to be disobedient, among other unlawful and violent acts"), and we do not perceive the point to be particularly controversial. Accordingly, we conclude that, even without direct officer testimony on this point in the record, we can take judicial notice of the fact that SAC is a violent gang.

2. *See* Cal. Penal Code § 187 (West 2019).

driver agreed. Meanwhile, one of the other officers had run the names of the passengers of the Blazer through a police database, and discovered that the backseat passenger had two warrants for his arrest. At that point, the officers asked everyone to exit the Blazer so that they could conduct the search and arrest the passenger. All three men in the Blazer, including Mitchell, complied with this request without complaint or incident.

¶6     Immediately after Mitchell exited the vehicle, one of the officers frisked him. During the pat-down, the officer discovered a switchblade-style knife in the pocket of Mitchell's shorts. Because he was a convicted felon, Mitchell was not allowed to possess such a weapon, so the officers then arrested Mitchell for unlawfully possessing the knife. After arresting Mitchell, the officers conducted a more thorough search of his person and discovered "a ball of a black tar like substance" that was later confirmed to be heroin.

¶7     The State eventually charged Mitchell with possession of a controlled substance with intent to distribute, and possession or use of a dangerous weapon by a restricted person. Prior to trial, Mitchell moved to suppress any evidence related to his possession of the knife and the heroin, arguing that the officers did not have a reasonable articulable suspicion to support the initial frisk, and that if the officers had not frisked him they would not have discovered either the knife or the heroin. The district court held a hearing on Mitchell's motion, at which two of the officers, as well as Mitchell, testified under oath. In addition to the facts already described, one of the officers testified that, in his experience, "gang members typically carry weapons," and that this knowledge was among the reasons he had decided to frisk Mitchell. For his part, Mitchell testified that his profane words to the man in the parking lot were not intended to be aggressive, and that he was just attempting to greet an old friend whom he had not seen in a while.

¶8    At the conclusion of the hearing, the district court concluded that the officers had acted reasonably, and therefore denied Mitchell's motion to suppress. The court grounded its ruling on the presence of three facts: (a) that Mitchell was a known member of the SAC gang; (b) that Mitchell had acted aggressively toward, and appeared to be on the verge of starting a fight with, the individual in the parking lot; and (c) that the backseat passenger was being arrested for outstanding warrants, a fact that might increase the potential volatility of the situation.

¶9    Following the denial of his motion, Mitchell entered a conditional guilty plea[3] to possession of a controlled substance with intent to distribute, and the State agreed to dismiss the weapons charge. As part of his conditional plea, Mitchell retained his right to appeal the denial of his motion to suppress.

## ISSUE AND STANDARD OF REVIEW

¶10    Mitchell now exercises his right to appeal. We review the district court's "decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. Accordingly, we review the district court's factual findings for clear error, but we review its ultimate legal conclusion— including "whether a specific set of facts gives rise to reasonable suspicion"—for correctness. *See State v. Gurule*, 2013 UT 58, ¶ 20, 321 P.3d 1039 (quotation simplified).

---

3. With the consent of the prosecution and the approval of the judge, a defendant may enter a conditional guilty plea, while "preserv[ing] [a] suppression issue for appeal." *State v. Sery*, 758 P.2d 935, 938–40 (Utah Ct. App. 1988), *disagreed with on other grounds by State v. Pena*, 869 P.2d 932 (Utah 1994). "A defendant who prevails on appeal [after entering a conditional plea] shall be allowed to withdraw the plea." Utah R. Crim. P. 11(j).

ANALYSIS

¶11    The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures. Broadly speaking, "the touchstone of the Fourth Amendment is reasonableness, which is measured in objective terms by examining the totality of the circumstances." *State v. Baker*, 2010 UT 18, ¶ 10, 229 P.3d 650 (quotation simplified). To determine whether a search under the Fourth Amendment is reasonable, we weigh the competing interests of the public in police safety and mitigation of crime against the individual's right to be free from arbitrary interference by officers. *Id.*; *see also State v. Warren*, 2003 UT 36, ¶ 31, 78 P.3d 590.

¶12    In evaluating the reasonableness of police activity under the Fourth Amendment, courts must consider the nature of the police-citizen encounter, of which there are three general types:

> A level one encounter occurs when a police officer approaches a citizen and asks questions, but the person is not detained against his will and remains free to leave. A level two encounter occurs when a police officer temporarily seizes an individual because the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime. Finally, a level three stop occurs when a police officer has probable cause to believe that a crime has been committed and effects an arrest of the suspect.

*State v. Applegate*, 2008 UT 63, ¶ 8, 194 P.3d 925 (quotation simplified).

¶13    This case involves a level two encounter, which is sometimes referred to as "an investigative detention." *See State v. Hansen*, 2002 UT 125, ¶ 35, 63 P.3d 650 ("A level two encounter involves an investigative detention that is usually characterized

as brief and non-intrusive."). In particular, the type of level two encounter at issue in this case is a pat-down search for weapons, commonly known as a *Terry* frisk. *Terry v. Ohio*, 392 U.S. 1, 26–27 (1968); *see also Hansen*, 2002 UT 125, ¶ 35 (noting that level two encounters include "*Terry* stop[s]" (quotation simplified)). A *Terry* frisk is "constitutionally permissible" if two conditions are satisfied: (1) "the investigatory stop must be lawful," and (2) "the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009).

¶14 "The reasonableness of both the stop and the frisk are evaluated objectively according to the totality of the circumstances." *Warren*, 2003 UT 36, ¶ 14. In evaluating the reasonableness of police conduct in this context, "a court should question whether the facts available to the officer at the moment of the seizure or the search [justify] a [person] of reasonable caution in the belief that the action taken was appropriate." *Id.* (quotation simplified). An officer who conducts a lawful *Terry* frisk "must be able to point to specific facts which, considered with rational inferences from those facts, reasonably warrant the intrusion" upon a citizen's constitutional rights. *Id.* "Courts must view the articulable facts in their totality and avoid the temptation to divide the facts and evaluate them in isolation from each other." *Id.*

¶15 Here, Mitchell does not argue that the officers acted unlawfully in stopping the Blazer, and he therefore acknowledges that the first part of the *Terry* test is met. But Mitchell does contest the second part of the *Terry* test, asserting that the officers did not have a reasonable articulable suspicion that he was armed and dangerous. He points out—correctly— that many of the usual hallmarks of an armed and dangerous suspect are not present here. For instance, Mitchell was wearing very little clothing, and did not have many places to conceal a weapon; the officers did not notice a bulge in the clothing Mitchell was wearing; Mitchell did not make any movements

that suggested that he might be reaching for a weapon or attempting to conceal one; Mitchell did not have his hand in his pockets; there is no evidence that the officers were aware that Mitchell himself was typically armed; and Mitchell was completely compliant with every command given by the officers.

¶16 The State acknowledges the absence of the factors Mitchell lists, but defends the district court's ruling by pointing to three facts present here: (a) Mitchell was an admitted member of SAC; (b) Mitchell acted aggressively and profanely toward a bystander, appearing to be on the verge of starting a fight with him; and (c) the officers were in the process of arresting the backseat passenger when the pat-down took place. The State argues that these facts, considered in their totality, gave rise to a reasonable articulable suspicion that Mitchell was armed and dangerous. We discuss each of these three factual issues, in turn.

A

¶17 Due to their prior interactions with Mitchell, as well as Mitchell's ostentatious tattoos, the officers were aware that Mitchell was a member of SAC, a violent white supremacist gang. Moreover, one officer testified that gang members are more likely than other individuals to be armed, stating that, in his experience, "gang members typically carry weapons."

¶18 It has long been settled that "gang affiliation, by itself, is no basis for an investigative detention." *State v. Chapman*, 921 P.2d 446, 453 (Utah 1996). However, while gang affiliation is insufficient in isolation, it can be a factor that, paired with other factors, may contribute to a reasonable suspicion that a person is armed and dangerous. *See United States v. Garcia*, 459 F.3d 1059, 1066–67 (10th Cir. 2006) (explaining that gang affiliation is "not necessarily determinative by itself," but holding that it could be one factor among others pointing toward reasonable suspicion, stating that "apparent gang connection provides additional reason" for finding reasonable suspicion); *State v. Johnson*, 207

P.3d 804, 809 (Ariz. Ct. App. 2009) (holding that the defendant's suspected gang membership, coupled with the officer's knowledge that "gang members often carry firearms," was a factor contributing to the officer's reasonable suspicion that the defendant "might have been armed and dangerous").

¶19   In determining how much weight to give gang affiliation in a totality of the circumstances analysis, it is instructive to consider, among other things, the nature of the gang involved, and whether the officers actually know—or merely suspect—that the individual is affiliated with a gang. In this case, the gang in question is a violent white supremacist gang whose ideology lies displayed in tattoo form all over Mitchell's body, including a swastika wrapped around an iron cross tattooed to the back of his head; code for "Heil Hitler" tattooed in large print on his stomach; and "187"—the California Penal Code section for murder—tattooed on his face.

¶20   Moreover, the officers were not merely guessing that Mitchell might be part of a gang. In this case, they *knew* that Mitchell was a SAC member, because he had told them so on previous occasions, with one officer testifying that Mitchell was "pretty forthcoming about his involvement" in SAC. Indeed, Mitchell did not contest the fact that he is a member of SAC. In other cases, even an officer's suspicion—based, for instance, on the color of clothing the individual is wearing, the part of town the individual is in, or the company the individual keeps—that an individual might be a member of a gang has been considered a proper factor in a "totality of the circumstances" analysis. *See, e.g.*, *Garcia*, 459 F.3d at 1066–67 (holding that officers had reasonable suspicion to frisk a defendant, in part because he was present in an apartment with other known gang members); *Johnson*, 207 P.3d at 808 (holding that officers had reasonable suspicion to frisk the defendant, in part because he was wearing blue clothing in a part of town known to be frequented by "a gang whose members frequently wear blue clothing"). But here, the officers knew for certain that Mitchell was a member of a

violent white supremacist gang, and therefore we afford more weight to the gang factor than would perhaps be justified if the officers merely suspected gang involvement, or if the gang in question were not known to be violent.

B

¶21    In addition to knowing that Mitchell was a member of SAC, the officers had also just observed potentially violent behavior by Mitchell. As described above, Mitchell unleashed a loud and profane salutation toward an individual in the convenience store parking lot, and it appeared to the officers as though Mitchell was acting aggressively and that he was on the verge of starting a physical altercation with that individual.

¶22    Utah courts have recognized that "loud and boisterous behavior is a fact that tends to support an officer's reasonable suspicion that a suspect may be armed and dangerous." *State v. Parke*, 2009 UT App 50, ¶ 12, 205 P.3d 104 (quotation simplified); *see also State v. Warren*, 2003 UT 36, ¶ 33, 78 P.3d 590 (citing "loud and boisterous behavior" as a factor that can support reasonable suspicion). However, not all loud and boisterous behavior is created equal; a noisy celebration of a sports team's victory will likely be less troubling than confrontational behavior actually directed toward another person, especially if directed toward an officer or exhibited in an officer's presence. *Compare United States v. Garcia*, 751 F.3d 1139, 1144 (10th Cir. 2014) (factoring into the analysis officers' knowledge of a previous encounter in which the suspect had "act[ed] combatively toward police officers"); *and United States v. Brown*, 232 F.3d 589, 590 (7th Cir. 2000) (factoring into the analysis a suspect's loud and profane behavior directed toward bystanders who were not police officers), *with United States v. Williams*, 731 F.3d 678, 681 (7th Cir. 2013) (holding that reports of individuals "being loud while loitering in the parking lot of . . . a local bar," without any indication of aggression toward anyone, was insufficient to constitute loud and boisterous behavior); *and Parke*, 2009 UT

App 50, ¶ 8 (holding that a suspect becoming "somewhat agitated" in response to questioning did not constitute loud and boisterous behavior (quotation simplified)). In particular, although many people carry weapons for defensive purposes, common sense tells us that a person trying to start a fight is at least somewhat more likely to have a weapon than a person trying to avoid one; after all, having a weapon in one's pocket tends to raise the odds of victory in any resulting altercation.

¶23   While Mitchell contested the officers' perception of the nature of his salutation, claiming his words to have been a mere friendly greeting, the district court acknowledged the reasonableness of the officers' interpretation of events, and we are not in any position to second-guess that interpretation. *See State v. Markland*, 2005 UT 26, ¶¶ 11–17, 112 P.3d 507 (explaining that "it is settled law that an officer is not obligated to rule out innocent conduct prior to initiating an investigatory detention," and holding that courts must "accord deference to an officer's ability to distinguish between innocent and suspicious actions" (quotation simplified)). Accordingly, we accept, for the purposes of our analysis, that the officers reasonably believed that Mitchell was attempting to start a fight with the individual.

¶24   And once that perception is accepted, Mitchell's behavior becomes highly relevant. The officers personally witnessed Mitchell yell profanely and aggressively at a bystander, stand up in the seat of the Blazer, and act as though he was about to initiate a physical altercation. Exhibition of this particular kind of loud and boisterous behavior is a factor that weighs significantly in favor of a determination that the officers reasonably suspected that Mitchell was armed and dangerous.

C

¶25   Finally, the officers also knew that they were about to arrest the Blazer's backseat passenger. While this fact does not

make it more likely that Mitchell was armed, it does raise the risk that Mitchell might have been dangerous.

¶26    Our supreme court has noted "that there are inherent safety concerns in all traffic stops," and that "officer safety is an inherent aspect of the governing caselaw, which we are not at liberty to disregard." *State v. Warren*, 2003 UT 36, ¶ 23, 78 P.3d 590 (quotation simplified). While officers cannot *Terry* frisk all occupants of a vehicle simply for safety reasons, *see id.* ¶ 25, the circumstances of a particular traffic stop may give rise to specific concerns. For example, when officers must initiate an arrest in a public place, courts have noted that officer safety concerns related to the arrest can factor into an analysis of whether a level two detention of a bystander is appropriate. *See United States v. Maddox*, 388 F.3d 1356, 1366–67 (10th Cir. 2004) (holding that officers were justified in temporarily detaining a bystander at an arrest scene, in part because of officer safety concerns); *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995) (holding that, where the officers were "unaware of the nature of [a bystander's] relationship" to a person they were arresting at the scene, "[t]he governmental interest in securing the area around [the arrestee] and protecting officers from potential danger is sufficient to justify" a temporary level two detention).

¶27    Here, the officers were in the process of arresting one of the passengers. Mitchell was known to be a member of a gang, and gang members are known to be loyal to one another. At the time they made the arrest, the officers did not know whether the arrestee was a member of the same gang as Mitchell, a fact which (if true) would raise the risk that the arrest might spark an incident. In addition, regardless of the relationship between Mitchell and the arrestee, one or more of the officers was going to need to direct their attention to finalizing the arrest, and would thereby be distracted from other matters, including keeping an eye on Mitchell and the driver. *See United States v. Garcia*, 751 F.3d 1139, 1145–46 (10th Cir. 2014) (holding that the

fact that the officer would be distracted by conducting a search of a vehicle could be a factor supporting a *Terry* frisk).

¶28   Under these circumstances, where officers executing a valid arrest warrant have firsthand knowledge of a bystander's involvement in a violent gang, that bystander's presence during the arrest is another factor to consider in determining whether officers had reasonable suspicion to support a *Terry* frisk.

D

¶29   When we consider the circumstances of this case in their totality, we are persuaded that the officers had reasonable suspicion that Mitchell might be armed and dangerous, and were therefore justified in conducting a *Terry* frisk.

¶30   As noted above, "whether an officer has reasonable suspicion to subject an individual to a *Terry* stop and frisk is evaluated objectively according to the totality of the circumstances." *State v. Peterson*, 2005 UT 17, ¶ 11, 110 P.3d 669 (quotation simplified). In examining the totality of the circumstances, the touchstone of the analysis is whether "the facts available to the officer at the moment of the seizure or the search [justify] a [person] of reasonable caution in the belief that" the frisk was lawful. *State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590 (quotation simplified). In short, this step of the analysis requires the careful weighing of each recognized and relevant factor supporting reasonable suspicion against any factors that would seem to mitigate the danger. *See State v. Baker*, 2010 UT 18, ¶ 55, 229 P.3d 650 (weighing facts increasing the danger associated with traffic stops—such as the late hour of the stop, the officer's suspicion that the suspect was involved in drug-related activity, and the need to impound the suspect's car—against mitigating factors, such as the suspect's cooperation, lack of threatening behavior, and the officer's subjective lack of fear for their safety). In doing so, we examine the factors with an eye toward preserving the "balance between the public interest and

the individual's right to personal security free from arbitrary interference by law officers." *Id.* ¶ 10 (quotation simplified).

¶31 In this case, Mitchell correctly points out that this case lacks many of the usual indications that a person might be armed and dangerous. As noted above, once he was aware of their presence, Mitchell was cooperative with the officers and did not act aggressively toward them; the officers saw no bulge in his pockets; and Mitchell did not act as though he was attempting to retrieve or conceal a weapon. Moreover, we are not necessarily convinced that any of three factors relied on by the State, standing alone, would be sufficient to amount to reasonable articulable suspicion. Mitchell's status as a member of SAC is not enough by itself, and neither is Mitchell's profane salutation toward the individual in the parking lot. But under the unique circumstances of this case, those two factors, viewed together, gave rise to a reasonable suspicion that Mitchell might be armed—after all, he was a member of a violent gang and the officers reasonably believed that he was acting aggressively toward, and about to start a physical altercation with, a bystander. And the danger of the situation, from an officer-safety standpoint, is heightened by the fact that the officers were going to arrest one of Mitchell's fellow passengers, whose exact relationship to Mitchell was at the time unknown. While we consider this a close case, we are ultimately persuaded by the State's position that the officers had reasonable articulable suspicion to conduct a *Terry* frisk.

## CONCLUSION

¶32 Because the officers had reasonable suspicion to support their pat-down of Mitchell, the district court did not err in denying Mitchell's motion to suppress.

¶33 Affirmed.

_____