2021 UT App 94

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANTONIO VALENTIN RUIZ,
Appellant.

Opinion
No. 20190809-CA
Filed September 2, 2021

Second District Court, Ogden Department
The Honorable Reuben J. Renstrom
No. 181900918

Joseph Jardine and Peter D. Goodall, Attorneys
for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGE JILL M. POHLMAN and SENIOR JUDGE KATE
APPLEBY concurred.[1]

CHRISTIANSEN FORSTER, Judge:

¶1     Ogden City police officers stopped Antonio Valentin Ruiz
on suspicion of brandishing a firearm during a disturbance.
During the stop, an officer deployed a drug detection K-9 to
conduct an exterior sniff of Ruiz's car. As the K-9 passed the
driver-side door of the vehicle—the window of which was
partially open—he paused, changed his behavior, dropped to all
fours, and spontaneously jumped into the car through the

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

halfway-open window. After about thirty seconds, the K-9 stopped and stared at the center console, indicating that he had located the source of the contraband odor. An officer searched the car and found rolling papers in the center console and, more significantly, a loaded handgun under the driver seat. Ruiz was arrested and charged with possession of a firearm by a restricted person.[2] The district court denied Ruiz's motion to suppress the evidence on constitutional grounds, and Ruiz pleaded guilty while preserving his right to appeal the court's order denying his motion. We affirm.

BACKGROUND

¶2    In April 2018, a police officer (Sergeant) responded to a report of four men "getting out of a white, older-model Cadillac" and "brandishing firearms" outside a house in Ogden, Utah. Sergeant, who was familiar with the address of the house because he had driven by it earlier as part of his normal patrol duties, recalled having observed the presence of a similar car there. Another responding officer reported that the car was not currently at the house, so Sergeant parked down the street from the house in case the vehicle should return. Sergeant noticed a car matching the description from the earlier report "slowly coming up the road" and concluded the driver "may have seen the [police] activity going on at the house and then made a quick turn onto" a nearby street. Sergeant followed the car and noticed

─────────────────────────

2. "Under Utah law, possession of a weapon by a restricted person is a crime that can be charged as anything from a class A misdemeanor up to a first-degree felony, depending on the type of weapon involved and on various other factors, including the defendant's criminal history." *State v. Gallegos*, 2020 UT App 162, ¶ 4 n.1, 479 P.3d 631. Ruiz is a restricted person because of his criminal history and was accordingly charged with a second-degree felony. *See* Utah Code Ann. § 76-10-503(2)(a) (LexisNexis 2017).

that it had pulled into the rear parking lot of a nearby apartment building. Sergeant activated his emergency lights, pulled into the parking lot, and requested backup.

¶3    As he was pulling into the parking lot, Sergeant saw the sole occupant and driver, later identified as Ruiz, get out of the car. Sergeant told Ruiz that police were investigating a firearm disturbance and asked him if he had any weapons. Ruiz said he did not and agreed to let Sergeant "check [his person] real quick" just to verify. The frisk did not reveal any weapons.

¶4    During the investigation, Sergeant received an update that the house was a known gang residence and other officers had identified gang members living there. This news, coupled with Ruiz's evasive driving and the investigation of the earlier firearm disturbance, led Sergeant to suspect "there might be a gun" in the car. Sergeant asked Ruiz if he could search the car, but Ruiz refused, saying that the car belonged to his father.

¶5    Several officers arrived at the parking lot, including an officer (Officer) and his K-9, Odin. While Sergeant was speaking with Ruiz, Officer walked Odin around the exterior of the car. Officer's body-camera footage shows that three of the car's windows (driver, passenger, and rear passenger) were partially open by approximately one foot. Officer explained that as Odin walked by the driver-side window, he "sniff[ed] intently in there and then he jumped into the car," even though Officer was trying to restrain him because he "didn't want him to get hurt trying to jump in that window." Officer described this change in behavior as an "alert," which Odin displays by raising his ears, becoming "more focused," and "inhaling in a different manner." Odin spent about thirty seconds inside the car, during which time he "gave a positive indication of the odor of narcotics." According to Officer, Odin "indicates" by stopping and staring—"he'll just freeze and stare at the area where the odor is." Odin then jumped out of the car through the same window, and Officer returned him to the police cruiser.

¶6    When asked whether there were drugs in the car, Ruiz told Officer there were not. Officer searched the car and found rolling papers in the center console and a fully loaded handgun under the driver seat.

¶7    Ruiz was charged with possession of a firearm by a restricted person. Ruiz moved to suppress evidence of the firearm, wrapping papers, and any statements he made following the search of the car, arguing that his Fourth Amendment rights were violated when Odin entered the car. The State opposed the motion. Officer and the director of the State's K-9 training program (Director) testified at the evidentiary hearings on Ruiz's motion.

¶8    Officer and Director each described how a K-9 signals that it has detected the odor of contraband it has been trained to find. Officer explained that a K-9 will change its behavior to show it has detected the odor by giving an "alert," meaning "a change of behavior." Officer described Odin's "alert" behavior:

> It's like he's searching, and all of a sudden, aha, I've got it, and he'll start bracketing, working in the area.
>
> . . . .
>
> It's different depending on what it is. But he will usually go from . . . just direct searching to a more closed-mouth, more intent [sniffing]. His ears pick up. His tail kind of gets a little more rigid, might wag a little. And he'll start directing in a more focused area.

¶9    Director explained that an "alert is a natural behavior exhibited by each individual dog" in which a K-9 shifts from "a general sniffing behavior to a . . . focus on a certain area. . . . [T]he dog tries to focus in using the air current available to it on the source of the odor." Moreover, Director explained that when

a K-9 alerts, "the sniffing pattern[] tends to change from being a moderate amount of sniffing, one sniff after another, sort of a sniff, sniff, sniff, sniff throughout the search area to . . . a deep, nasal inhalation that . . . is normally easy to hear even from several feet away." And when a K-9 alerts, it generally discontinues the sniff pattern and "stays right where it is" to find the "strongest source of odor." Officer testified much the same: "[T]he dog's trained" so that "when he smells the odor, he's going to try and get as close to it as he can. We train him to take it to the source."

¶10 Officer and Director also testified about the training K-9s receive. Officer testified that Odin was trained to "follow his nose anywhere to get his reward." He clarified that Odin was never trained "to go into cars, and [Officer had] never trained [Odin] to stay out, either." Rather Officer had "trained him to follow his nose to the source." Officer testified that Odin had been trained to indicate on the odors of marijuana, cocaine, methamphetamine, and heroin.

¶11 Director explained that K-9s are initially selected because they have "an extremely high drive to hunt." He elaborated,

> Once that dog with such a high work ethic learns that finding [certain] odors will produce . . . a reward, then that dog becomes very intense in finding the target odor once it has been given the direction to search, to sniff.
>
> . . . [T]he only training we have to give them is how to go about doing what they have very high genetic potential to do.
>
> And so . . . we more or less channel their working drives . . . towards certain odors and away from other odors.

Director continued,

Once the dog understands the task that we want him to perform, we really only have to kind of point him in the right direction.

. . . Instead of letting the dog just run around haphazard as the dog may do, the officer makes a systematic search pattern and encourages the dog to stay on the vehicle; in this case, stay on the vehicle that the officer would like the dog to sniff and not run into other areas that may not be part of the investigation.

¶12 Director explained that K-9 officers are trained to "not do anything to change [the] configuration" of a vehicle they are searching. Specifically, if the vehicle's windows are rolled up, officers are trained "to take the dog around the outside of the car, but they would not be allowed to roll down windows or open doors."

¶13 With regard to K-9s entering a vehicle, Director testified that "officers should not encourage a dog to jump in a car." But when a K-9 detects a target odor of a contraband substance, the K-9 reacts. Director further explained,

We also understand that this dog is a wonderful sniffing instrument. And if he smells a target odor on the interior of the car, whether he can gain access or not, he should focus in on whatever that source of odor is.

And if—if the dog perceives that it can get inside the car, then it is doing so on its own initiative, and we are not encouraging, we are not coercing or coaxing the dog to go in the car, then that is—that is allowed according to our understanding of current laws and court rulings.

State v. Ruiz

¶14    In the case of K-9s detecting drug odors through open windows, Director explained that odors detectable to a K-9 are treated similarly to odors detectable to a human officer. "If an officer who has experience and training in the detection of the smell of narcotics smells something, then they also can go in based on the plain smell . . . ." Director explained that, in a like manner, "[i]f a dog smells a target odor which is . . . contraband . . . , the dog will act." Director continued, "So there's a parallel between what the dog does and what the human officer does. So there is no difference," except that the K-9 has a better "sniffer."

¶15    Regarding the absence of any drugs found in Ruiz's vehicle, Officer and Director explained that it did not mean Odin had made a mistake. Instead, Odin may have detected the residual odor of contraband that had been in the car. Moreover, Officer explained that Odin is capable of detecting the odor of very small amounts of contraband that may not be readily observable to a human officer conducting a search because the bits of the illegal substance may have fallen into the carpet or between the seats. Director also stated that although it was "always possible" for a K-9 to alert on a non-target odor, "the probability of that is very, very low due to the nature of the training . . . . And statistically that almost never happens."

¶16    In ruling on the motion to suppress, the district court found that (1) the windows of Ruiz's car were partially open, (2) "Odin jumped into the vehicle through one of the partially opened windows," (3) Odin's leap into the vehicle occurred "[w]ithout discernable warning" and Officer "appeared to be surprised by the leap," (4) Officer did not attempt to restrain the leaping K-9 and could be heard in the video footage commenting "that the dog was going to hurt himself," (5) it seemed "Odin could have been hurt if [Officer] attempted to yank him out of the vehicle or even restrain him," (6) Officer "did not encourage the leap nor the sniff of the interior of the vehicle," and (7) "the police did not open the windows or encourage the dog to enter the vehicle." Noting that "unencouraged trained canines who

spontaneously enter a vehicle do not violate the Fourth Amendment of the United States Constitution" and that "[p]olice passivity, when a trained canine spontaneously enters a vehicle, does not amount to encouraging the canine to enter the vehicle," the court concluded "that the search following Odin's entrance of [Ruiz's] vehicle was not in violation of the United States Constitution." Accordingly, the court denied Ruiz's motion to suppress.

¶17    Ruiz entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress. *See State v. Sery*, 758 P.2d 935, 938–40 (Utah Ct. App. 1988) (allowing conditional pleas that preserve suppression issues for appeal); *see also* Utah R. Crim. P. 11(j). Ruiz appeals.

ISSUE AND STANDARDS OF REVIEW

¶18    Ruiz contends that the district court erred when it denied his motion to suppress, arguing that Odin's leap into the car violated the Fourth Amendment's proscription against unreasonable searches and seizures. "We review the district court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Mitchell*, 2019 UT App 190, ¶ 10, 455 P.3d 103 (quotation simplified). "While the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937.[3]

_____

3. In the alternative, Ruiz argues that even if the search was permissible under federal precedent, "the State Constitution should be interpreted to provide greater protection so as to require suppression." Ruiz contends that "existing federal precedent" gives "inconclusive guidelines as to the acceptable parameters of constitutional conduct and citizens are provided

(continued…)

ANALYSIS

¶19 Ruiz asserts that the district court erred in denying his motion to suppress because Odin's entry into the interior of his car through the partially open window violated his Fourth Amendment rights. "In addressing this assertion, we note that while a dog sniff of the exterior of a vehicle parked in a public place is not a Fourth Amendment intrusion, a drug dog's entry into a vehicle prior to the establishment of probable cause may raise Fourth Amendment concerns because people have a reasonable expectation of privacy in the interior of their automobiles." *United States v. Lujan*, 398 F. App'x 347, 350 (10th Cir. 2010) (quotation simplified); *accord United States v. Wilson*, 278 F.R.D. 145, 152 (D. Md. 2011); *see also State v. Larocco*, 794 P.2d 460, 466 (Utah 1990) ("[A] constitutional privacy interest exists in the interior of an automobile . . . .").

¶20 Federal appellate courts, including the Tenth Circuit, have "upheld the legality" of a K-9's entry into a vehicle while conducting an exterior sniff when, as here, "(1) the dog's leap

_____

(…continued)

with inconsistent protection of their rights" insofar as interior K-9 sniffs are concerned. "While we acknowledge that 'choosing to give the Utah Constitution a somewhat different construction may prove to be an appropriate method for insulating this state's citizens from the vagaries of inconsistent interpretations given to the fourth amendment by the federal courts,' [Ruiz] has not convinced us that deviating from the federal standard is appropriate in this case." *See State v. Lloyd*, 2011 UT App 323, ¶ 8, 263 P.3d 557 (citation omitted) (quoting *State v. Watts*, 750 P.2d 1219, 1221 n.8 (Utah 1988)). As we explain, existing federal precedent on the issue presented in this appeal is not plagued by "the vagaries of inconsistent interpretations," *see id.* (quotation simplified), as Ruiz suggests. Accordingly, we decline Ruiz's invitation to analyze Odin's entry into the car under a more expansive standard.

into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog." *United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009); *accord United States v. Moore*, 795 F.3d 1224, 1227, 1232 (10th Cir. 2015) (concluding that a K-9's entry through a window the suspect had left open did not violate the Fourth Amendment); *United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012) ("[A] trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump."); *United States v. Pierce*, 622 F.3d 209, 211, 214–15 (3d Cir. 2010) (holding that a K-9 "act[ing] instinctively and without facilitation by his handler" and jumping through an already open window does "not constitute a search requiring a warrant or probable cause"); *United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007) ("Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment.").

¶21    First, "'instinctive' implies the K-9 enters the car without assistance, facilitation, or other intentional action by its handler." *Pierce*, 622 F.3d at 214. A drug-sniffing "dog's instinctive actions [do] not violate the Fourth Amendment" where "[t]here is no evidence . . . that the police asked [a suspect] to open the [vehicle] so the dog could jump in" or "any evidence the police handler encouraged the dog to jump in the car." *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989); *see also Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 880 (10th Cir. 2014) ("Where there is evidence that it is not the driver but the officers who have created the opportunity for a drug dog to go where the officer . . . cannot go, the Fourth Amendment protects the driver's right to privacy to the interior compartment until the dog alerts from the exterior of the car."); *United States v. Minor*, No. 417-cr-00005-SEB-VTW-01, 2019 WL 5420462, at *4 (S.D. Ind. Oct. 23, 2019) (noting that the Third, Sixth, Eighth, and Tenth Circuits have unanimously held as reasonable those searches in which a drug-sniffing K-9 jumps into a vehicle so long as the officers did not request that the window be opened or prompt

the K-9 to jump into the vehicle). Thus, while an officer may "not direct the dog to enter the vehicle without a warrant or the owner's consent," "the instinctive actions of a trained canine do not violate the Fourth Amendment*." Lyons*, 486 F.3d at 373.

¶22   Second, "the fact that the passenger window of the vehicle [is] open, creating an opportunity for the dog to breach the interior of the vehicle, [does] not render [a] search unlawful," provided that the officer does not open the window, order the window be opened, or order the window to remain open. *See United States v. Williams*, 690 F. Supp. 2d 829, 844–45 (D. Minn. 2010). But when an officer opens the door of a vehicle, "thus creating the opportunity" for a drug-sniffing K-9 to enter a vehicle, that entry violates the Fourth Amendment because the officer "facilitated" the K-9 sniff of the vehicle's interior. *See United States v. Winningham*, 140 F.3d 1328, 1330–31, 1331 n.2 (10th Cir. 1998).

¶23   Ruiz does not contend that the police opened the windows or engaged in any sort of misconduct at the scene in facilitating Odin's entry into the car. Rather, he argues that (1) Officer should have restrained Odin's entry into the car and (2) Odin's training encouraged him to enter open windows.

¶24   Ruiz asserts that Officer "had the opportunity to call [Odin] back or tell him to 'stop' and 'come.'" Ruiz contends that because Officer "had the opportunity to correct the unconstitutional conduct of his canine but did not do so," "suppression is appropriate under federal law." But Ruiz cites no precedent establishing that an officer's failure to restrain a K-9 trying to find the source of an odor by jumping through an open window results in an unconstitutional search. Federal appellate courts have held that officers may not encourage or facilitate a K-9's entry into a vehicle, not that they are required to actively prevent the K-9's entry. Moreover, Officer did not have the opportunity to prevent Odin from jumping into the car; Odin made his leap without direction, with no discernable warning, and to Officer's surprise. Finally, Officer had good reason for not

attempting to restrain Odin when he jumped. As the court observed in its findings of fact, "It seems obvious that Odin could have been hurt if [Officer] attempted to yank him out of the vehicle or even restrain him."

¶25 Moreover, Odin's leap through the partially open window was instinctual because he was following his natural drive to locate the source of the contraband odor that he had learned to identify. As Officer and Director testified, Odin was trained to "follow his nose" to the source of the odor of contraband drugs. *See supra* ¶ 10. But Ruiz argues that Odin's "entry into the vehicle was not instinctive, it was trained." In making this argument, Ruiz does not sufficiently distinguish between training and instinct. In the context of a K-9 sniff, "'instinctive' implies the K-9 enters the car without assistance, facilitation, or other intentional action by its handler," *Pierce*, 622 F.3d at 214, not that the K-9 is untrained. Ruiz's reasoning that Odin's training precluded his unprompted leap through the open window from being "instinctive" does not adequately separate the training of K-9s from their natural instinct. In other words, Odin's natural drive to locate the source of the odor of drugs emanating through an open window was instinctive even though he had learned he would be rewarded when he pinpointed the source. Odin's training was not ultimately the reason he jumped through the open window during the search; rather, he instinctively entered the car when he detected an odor he had been trained to locate.

¶26 More specifically, Ruiz argues that Odin was encouraged to enter the car by virtue of his training: "When a [K-9] jumps into a car [during training], he is not told, 'no' or 'come,' he is rewarded when he finds drugs. By training Utah's [K-9s] in this way, the police are encouraging them to enter vehicles." From this aspect of Odin's training, Ruiz concludes that Director and Officer "trained Odin to enter open windows." But Ruiz misses the mark here. While Officer and Director each testified that K-9s are trained to sniff vehicles with open windows, neither stated that Odin or other K-9s are trained to jump through open

windows or enter vehicles. Officer explicitly stated that Odin has "never been trained to jump in the window." And Director merely stated that Odin's training included vehicles with open windows. Thus, the record testimony was that Odin was trained to sniff and identify odors emanating from vehicles. Odin was not trained to jump into vehicles in search of drug odors; rather, he was trained to follow the drug odors emanating from vehicles. In other words, Odin entered the car based on his natural instincts when he detected the targeted odor while he was sniffing the exterior of Ruiz's vehicle.

¶27　A recent opinion from the Idaho Court of Appeals addresses a similar argument to the one Ruiz makes here. *See State v. Randall*, No. 46893, 2020 WL 4691650 (Idaho Ct. App. Aug. 13, 2020), *review granted* (Mar. 18, 2021). In that case, during an exterior sniff of a car, a K-9 jumped through an open window and, once inside the car, alerted on the back seat. *Id.* at *2. A subsequent search revealed sixty-five pounds of marijuana. *Id.* On appeal, the defendant alleged the K-9's "entry into the interior of [the] car absent probable cause constituted an unlawful search." *Id.* at *3. Among the defendant's arguments was that "law enforcement officers could train drug-detection dogs to jump through open car windows whenever possible; therefore, there [was] insufficient evidence to conclude that [the dog] jumped through the window to follow a scent as opposed to following his training to jump through windows." *Id.* at *7. The court rejected this argument, stating that there was "no evidence in the record suggest[ing] [the K-9] was following training to jump through an open window as opposed to tracking a scent to its source." *Id.*

¶28　While this Idaho decision has no precedential value for our court, we find the reasoning persuasive. As in that case, there is no evidence here to suggest that Odin was trained to jump through open windows in search of drug odors. But there is ample evidence that Odin was trained to "follow his nose," *see supra* ¶ 10, to the source of contraband odor he had already detected. The leap into Ruiz's car was a consequence of Odin

already having detected the odor and tracking that odor. Put another way, the leap into the car did not result in Odin detecting the odor; rather, the detection of the odor resulted in Odin's leap. It was thus Odin's detection of the targeted odor that justified his entry into the vehicle. *See United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010) (stating that when a "dog perceived a narcotics odor while outside the car," it "creat[ed] probable cause to believe that narcotics were present even prior to the dog's entry into the vehicle"); *see also State v. Griffith*, 2006 UT App 291, ¶ 6, 141 P.3d 602 ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." (quotation simplified)). Borrowing words from the Idaho decision, Odin "smelled drugs while outside the car and jumped through the open window to follow the scent to its source." *See Randall*, 2020 WL 4691650, at *7.

¶29    Given the circumstances prompting Odin's leap through the open window, we conclude that Odin's entry into Ruiz's car did not run afoul of the Fourth Amendment.

CONCLUSION

¶30    We conclude that the district court did not err in denying Ruiz's motion to suppress. The police did not engage in any misconduct—that is, they did not cause the windows of Ruiz's vehicle to be opened or encourage Odin to make a leap. Moreover, Odin instinctively—and unprompted by police— followed the odor of a narcotic substance into Ruiz's car. Affirmed.

––––––––––