2026 UT App 29

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DONALD DEE ANDERSON,
Appellant.

Opinion
No. 20220321-CA
Filed March 5, 2026

Second District Court, Farmington Department
The Honorable Michael Edwards
No. 191702417

Scott L Wiggins, Attorney for Appellant

Derek E. Brown, Joshua J. Prince, and
Jeffrey D. Mann, Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1 During an encounter in a gas station parking lot, a police officer (Officer) learned that Donald Anderson had outstanding warrants for his arrest. After Officer arrested Anderson on those warrants, he searched Anderson's vehicle. During that search, Officer found illegal drugs and a pipe bomb.

¶2 Anderson was charged with various offenses stemming from what was found inside his vehicle. He later moved to suppress the evidence. The district court denied the motion, and Anderson now challenges that denial on appeal. For the reasons set forth below, we affirm.

## BACKGROUND[1]

¶3    While working a patrol shift late one evening in November 2019, Officer drove into a gas station parking lot and began running "records check[s]" on the license plates of various vehicles that were there. Officer later testified that running the plates from "random vehicles" was something that he typically did during his shifts.

¶4    When Officer ran the license plate of one particular vehicle that was at a gas pump, the search showed that the registered owner was "Donald Anderson," and when Officer then ran a search on Anderson's name through another database, he learned that "there [were] numerous state warrants" for Anderson's arrest.[2] While Officer was running the records searches, the driver moved the vehicle from the gas pump to a parking stall in front of the gas station. Officer then pulled up somewhere near the vehicle without activating his lights.[3] Officer approached the driver's side window, which was partially open, and he asked the driver if he was Anderson. The driver confirmed that he was, and he then "immediately" volunteered that he had warrants out for his

---

1. The district court conducted an evidentiary hearing on Anderson's motion to suppress, after which it issued findings of fact. We accordingly "recite the facts in the light most favorable" to the district court's findings. *State v. Hansen*, 2025 UT App 121, n.1, 576 P.3d 1160 (quotation simplified).

2. From the record, it seems clear enough that both searches were from government databases. We'll refer to them together as the "records searches" moving forward.

3. As will be discussed below, there was a dispute at the evidentiary hearing about where Officer parked, but we find that dispute to be immaterial.

arrest. Officer asked Anderson to step out of the vehicle, and Officer then arrested Anderson.

¶5      After Officer placed Anderson in the back of his patrol vehicle, another law enforcement officer arrived to assist. Officer asked the backup officer to have his K9 walk around the vehicle and conduct a "free air sniff." When doing so, the K9 alerted on the vehicle. Officer read Anderson his *Miranda* warnings, and Anderson agreed to speak with Officer. During this conversation, Anderson denied knowing that any illegal drugs might be in the vehicle.

¶6      During a subsequent search of the vehicle, Officer discovered drugs, drug paraphernalia, and a pipe bomb. In an ensuing discussion, Anderson denied knowing anything about the drug-related items. Anderson admitted that he had made the pipe bomb a couple of years earlier, though he said that "he had no intentions of using it." As Officer transported Anderson to jail, however, Anderson admitted that some of the drugs and drug paraphernalia were his and that he knew the items were inside the vehicle.

¶7      The State charged Anderson with various offenses relating to both the drugs and the pipe bomb. Anderson later filed a motion to suppress the evidence that was obtained during the search of his vehicle.

¶8      The court held an evidentiary hearing on the motion, and Officer and Anderson both testified at that hearing. Both of them testified about where Officer had parked after Anderson had pulled into a parking spot in front of the gas station. Officer initially testified that he parked "a couple stalls away" from Anderson and that he was "positive" that he did not park behind him, but Officer later acknowledged that it was possible that he may have parked "at a diagonal or something" closer to Anderson's vehicle. For his part, Anderson testified that Officer had parked at "the rear driver's side of the vehicle, . . . at an angle,

with the front" of his patrol vehicle "facing" Anderson's vehicle. Anderson testified that although he "probably could have" reversed his vehicle and backed out, he would have had to "turn[] sharp to the right" and could not have "pull[ed] back out normally."

¶9    During his testimony, Officer said that both his dashcam and his bodycam were operational during the encounter. But Officer also said that he had not reviewed the footage and that it "may have been purged through the system" in the time since the incident.[4]

¶10    After the evidentiary hearing, Anderson filed a memorandum in support of his motion to suppress. Anderson raised what were essentially two sets of arguments. First, he argued that Officer violated the United States Constitution, the Utah Constitution, and the Utah Government Records Access and Management Act (GRAMA) by running the records searches. He then argued that without the information obtained from those searches, Officer had no justification for allegedly blocking Anderson in and approaching Anderson to ask him his name. Second, Anderson argued that the State violated his due process rights under the Utah Constitution by losing or even destroying the bodycam and dashcam footage of the encounter, which, in Anderson's view, could have shown that Officer had seized Anderson by blocking him into the parking stall.

¶11    The State opposed the motion, and the district court later issued a written ruling that denied it. First, the court concluded that under *State v. Oryall*, 2018 UT App 211, 437 P.3d 599,

---

4. Although this statement was less than definitive, Anderson subsequently claimed that the State had not preserved the footage, and the State pointedly did not dispute that contention in its submissions to the court. In the briefing on appeal, both parties have agreed that the footage was lost.

Anderson "did not possess a reasonable expectation of privacy in his motor vehicle registration records" under either the federal or state constitutions. Again relying on *Oryall*, the court also concluded that Officer did not violate GRAMA by conducting the records searches. From there, the court concluded that once Officer learned from the records searches that the vehicle was registered to "Donald Anderson" and that this individual had active arrest warrants, Officer could briefly detain the driver of the vehicle to determine whether he was indeed Anderson. In the court's view, since Officer then confirmed that the driver was Anderson, the ensuing arrest and search of the vehicle were permissible. Second, in light of the above conclusions, the court concluded that even if it were true that the missing dashcam and bodycam footage could have shown that Officer blocked in Anderson's vehicle, this would not have mattered because Officer already had reasonable suspicion at that point that Anderson was driving the vehicle and had active arrest warrants. The court accordingly denied this additional basis for the motion to suppress.

¶12    Anderson subsequently entered a conditional guilty plea. Under its terms, Anderson pleaded guilty to a single count of possessing or removing an explosive device, all other charges were dismissed, and Anderson reserved the right to appeal the denial of his motion to suppress.

ISSUES AND STANDARDS OF REVIEW

¶13    Anderson first argues that the district court erred in denying his motion to suppress, claiming that the records searches and the ensuing investigation violated his constitutional rights. "A district court's denial of a motion to suppress presents a mixed question of law and fact," wherein we review the court's "factual findings for clear error and its legal conclusions, including its application of law to the facts of the case, for

correctness." *State v. Oryall*, 2018 UT App 211, ¶ 5, 437 P.3d 599 (quotation simplified).

¶14 Second, Anderson also challenges the court's denial of his motion to suppress based on an alleged due process violation relating to the loss or destruction of evidence. We review this ruling for correctness. *See State v. Smith*, 2025 UT App 35, ¶ 36, 566 P.3d 811, *cert. denied*, 570 P.3d 660 (Utah 2025).

ANALYSIS

I. Records Searches

¶15 Anderson first argues that Officer violated his constitutional rights by running the records searches, blocking him into the parking stall, and asking his name. We disagree.

A. Reasonable Expectation of Privacy

¶16 The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. For these purposes, a search occurs when a state actor intrudes into an area for which a citizen has a "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); *see also Kyllo v. United States*, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."). Like the federal constitution, the Utah Constitution protects the "right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures," Utah Const. art. I, § 14, and this provision also turns on "whether an individual has a reasonable expectation

of privacy in the place or items being searched or seized," *State v. Andrus*, 2025 UT 32, ¶ 57, 575 P.3d 1071.[5]

¶17    In *State v. Oryall*, we examined the same threshold question that's before us here: whether an officer needs a "reasonable suspicion of criminal activity" before "run[ning] a license plate check on" a vehicle. 2018 UT App 211, ¶ 1, 437 P.3d 599. There, an officer had run a license plate search on a vehicle that had been driven past the officer on a public road, and that search revealed that the driver's license of the registered owner had been suspended. *See id.* ¶ 2. This information led to an investigatory stop, which then led to various charges being filed against the defendant. *See id.* ¶¶ 2–3.

¶18    The defendant later filed a motion to suppress, claiming that the search of her records was unconstitutional. *See id.* ¶ 4. On appeal, we affirmed the district court's denial of that motion. *See id.* ¶ 17. In doing so, we noted that federal courts had "unanimously determined that law enforcement officers may conduct warrantless and suspicionless checks of passing motorists' vehicle registration and driver's license information."

---

5. As noted, Anderson cited both the federal and state constitutions, and both have been interpreted to turn on whether a person has a reasonable expectation of privacy in the thing or area in question. In his brief, Anderson did not argue that there is any meaningful difference between these two standards. For purposes of this opinion, we'll accordingly assume without necessarily deciding that the two standards have the same scope.

We also note that a "parallel line of precedent has emerged" under which a person's Fourth Amendment rights can turn on a trespass-related inquiry. *See State v. Malloy*, 2021 UT 61, ¶ 18, 498 P.3d 358. But neither party has invoked that line of precedent in this case, so, like the parties, we'll focus on whether the records searches implicated a reasonable expectation of privacy.

*Id.* ¶ 8. We also noted that we were "aware of no other state that ha[d] construed its own constitution to require an officer to have a warrant (or at least reasonable suspicion) before checking a motorist's vehicle registration or driver's license records." *Id.* ¶ 9.

¶19 We then specifically rejected the defendant's request to "strike a different path under the Utah Constitution." *Id.* ¶ 10. We did so, in part, because of our conclusion that a person's right of privacy would not naturally "prevent a law enforcement officer—part of the state or local government—from accessing information that another part of that same government already lawfully possesses." *Id.* ¶ 13. And we said that we saw "nothing else from which we might conclude" that a person has "a reasonable expectation of privacy in [his or] her driver's license and vehicle registration records." *Id.* ¶ 16.

¶20 In this appeal, Anderson has not asked us to overrule *Oryall*. Under principles of stare decisis, that decision therefore controls, at least as far as it goes. *See Legal Tender Services PLLC v. Bank of Am. Fork*, 2022 UT App 26, ¶ 78, 506 P.3d 1211. Anderson does, however, ask us to distinguish *Oryall*. In his view, what makes this case different is that while the search in *Oryall* occurred on a public road, Officer in this case ran the records searches while in a gas station parking lot, which is private property.

¶21 But this is the proverbial distinction without a difference. As the State credibly points out in its brief, the gas station parking lot may well have been private property, but it was private property that was open to the public. Anderson cites no case in which a court has held that an officer may not run a records search on a vehicle that is in a parking lot that is open to the public. And there's plenty of authority to the contrary. In *State v. Atwood*, for example, we held that a defendant had no reasonable expectation of privacy in an "open and shared" parking lot behind an apartment house that the defendant shared with other tenants. 831 P.2d 1056, 1059 (Utah Ct. App. 1992). This was so because the

parking lot was not in the defendant's "exclusive control." *Id.* Many other courts have reached similar conclusions with respect to items or vehicles that were left in publicly accessible parking lots. *See, e.g., United States v. Cruz Pagan*, 537 F.2d 554, 557–58 (1st Cir. 1976) (holding that there was no "reasonable expectation of privacy with regard to objects left" in a condominium's common underground parking garage); *Roundtree v. Lopinto*, 976 F.3d 606, 609 (5th Cir. 2020) (holding that there was "no reasonable expectation of privacy" in a vehicle parked "in a shared apartment parking lot," even though "a private apartment parking lot is, definitionally, not 'public'"); *United States v. Diaz*, 25 F.3d 392, 396 (6th Cir. 1994) (holding that there was no reasonable expectation of privacy in a car parked in the parking lot of the motel the defendant was staying in).

¶22    More to the point of this case, the Sixth Circuit has considered the implications of this on license plates searches. In doing so, the court concluded that "so long as [an] officer had a right to be in a position to observe the defendant's license plate, any such observation and corresponding use of the information on the plate does not violate the Fourth Amendment." *United States v. Ellison*, 462 F.3d 557, 563 (6th Cir. 2006). And the court further noted that "every court that has addressed [the] issue" of whether there is a privacy expectation in either a license plate number or the records that can be obtained by searching it had "reached the same conclusion." *Id.* (quotation simplified).

¶23    In short, *Oryall* established that a motorist lacks a reasonable expectation of privacy in his or her governmental records while driving on public roads, and we see no basis for concluding that this somehow changes when the motorist pulls into a publicly accessible parking lot. We accordingly conclude that Officer did not violate Anderson's rights under the federal or state constitutions by running the records searches.

B.     GRAMA

¶24    Anderson next argues that the records searches violated the terms of GRAMA. Though a touch unclear, his argument seems to be that because GRAMA protected the records, this statutory scheme created a reasonable expectation of privacy in the records that made the searches unconstitutional.

¶25    The defendant in *Oryall* made the same argument, however, and we rejected it. *See* 2018 UT App 211, ¶¶ 14–15. As an initial matter, we "assume[d]," without necessarily deciding, "that automobile registration and driver's license records fall within the ambit of GRAMA." *Id.* ¶ 14 n.3. But even with that assumption, we then held that while GRAMA recognizes a citizen's "right of privacy in relation to personal data gathered by governmental entities," that right provides a "conceptual limit on the public's right to access governmental information, and not a general prohibition on one government agency accessing information possessed by another government agency." *Id.* ¶ 14 (quotation simplified). We supported this conclusion, in part, by reference to "three separate statutory subsections" from GRAMA that "appear to give law enforcement officers the right to access records such as vehicle registration and driver's license information." *Id.* ¶ 15 (quotation simplified).[6] We then noted that we saw no basis for concluding that any of these provisions were either "inapplicable" or "unconstitutional." *Id.*

¶26    On appeal, Anderson argues that contrary to what we said in *Oryall*, GRAMA does not actually permit law enforcement to conduct such searches. But his briefing on this point is cursory, and he has not persuaded us that we should either overrule *Oryall* or distinguish it. Given this, we accept *Oryall* as controlling on this

---

6. We cited Utah Code sections 63G-2-206(1)(b), 63G-2-206(9), and 63G-2-201(6)(a) (2016).

point, and we therefore reject Anderson's assertion that Officer's searches violated GRAMA.

C.      Ensuing Investigation

¶27     Because we have concluded that Officer could run the records searches, we next consider whether the information Officer obtained from those searches—namely, that the vehicle was registered to "Donald Anderson" and that this individual had outstanding arrest warrants—justified the ensuing investigation. It did.

¶28     "In evaluating the reasonableness of police activity under the Fourth Amendment, courts must consider the nature of the police-citizen encounter . . . ." *State v. Mitchell*, 2019 UT App 190, ¶ 12, 455 P.3d 103. There are three types of encounters:

> A level one encounter occurs when a police officer approaches a citizen and asks questions, but the person is not detained against his [or her] will and remains free to leave. A level two encounter occurs when a police officer temporarily seizes an individual because the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime. Finally, a level three stop occurs when a police officer has probable cause to believe that a crime has been committed and effects an arrest of the suspect.

*Id.* (quotation simplified).

¶29     In *Kansas v. Glover*, the United States Supreme Court considered a case in which an officer ran the license plate of a passing vehicle and learned that the vehicle was registered to a person with a revoked driver's license. 589 U.S. 376, 381 (2020). In the Supreme Court's view, learning this information created a "commonsense inference" that the driver of the vehicle was likely

its owner, and this inference then provided the officer with "more than [the] reasonable suspicion" that would be necessary to support a brief investigatory stop to determine whether this driver was driving without a license. *Id.*

¶30  This is virtually indistinguishable from what happened here. Again, Officer ran records searches that started from the license plate of a vehicle that he encountered in a publicly accessible parking lot, and these searches revealed that the vehicle's registered owner had multiple arrest warrants. As in *Glover*, the "commonsense inference" was that the driver of the vehicle was the owner of the vehicle, *id.*, and since Officer now knew that the owner had arrest warrants, Officer accordingly had reasonable suspicion to conduct a brief investigatory stop to determine whether this driver was indeed the owner. During the subsequent encounter, Anderson acknowledged that he was the owner of the vehicle and that he had outstanding warrants. Once Officer learned this, Officer had grounds to arrest Anderson. As noted, this arrest then led to the search of the vehicle that uncovered the incriminating evidence.[7]

¶31  In short, on the facts of this case, there seems to be a direct line from (i) the search of the government records to (ii) the

---

7. It's unclear from the record which constitutional doctrine the State relied on to support the search of the vehicle. In the briefing below, the State seemed to suggest at times that the search was justified because the K9 alerted on the vehicle. In other places below and again on appeal, the State suggests that the search was justified as an inventory search that was premised, in part, on Anderson's arrest. Regardless, Anderson does not argue on appeal that the search of the vehicle would have been unlawful even if Officer had lawfully learned that he had arrest warrants. Instead, Anderson's arguments are solely directed at the earlier questions of whether Officer could run the records searches and then approach him and ask him questions.

investigatory seizure of Anderson, and from there to (iii) either the arrest of Anderson or the K9 sweep around the vehicle, one of which led to (iv) the search of the vehicle. Because Anderson has not persuaded us that there was any constitutional error at any place in this sequence, we affirm the district court's conclusion that the search of the vehicle was lawful.

## II. Loss or Destruction of Evidence

¶32    Anderson next argues that the State violated his due process rights by losing or destroying evidence. We disagree.

¶33    The Utah Constitution's Due Process Clause entitles defendants to "information possessed by the State to aid in their defense." *State v. Tiedemann*, 2007 UT 49, ¶¶ 40, 41, 162 P.3d 1106. When evidence is lost or destroyed, courts engage in a two-step analysis to determine whether the loss or destruction of the evidence violates the defendant's due process rights. *See id.* ¶ 44. "First, the defendant must demonstrate a reasonable probability that the lost evidence would have been exculpatory—the threshold requirement." *State v. DeJesus*, 2017 UT 22, ¶ 27, 395 P.3d 111. "Only after the defendant has established" the threshold requirement "should a court consider" the second step. *Id.* ¶ 29. The second step involves balancing the "culpability of the State" against "the prejudice to the defendant" "to gauge the seriousness of the due process violation and to determine an appropriate remedy." *Id.* ¶ 27.

¶34    Anderson's argument is premised on his assertion that the bodycam and dashcam footage could have shown that Officer blocked him into the parking stall in front of the gas station. In Anderson's view, because Officer did not yet have grounds to detain him, this footage could have supported his motion to suppress.

¶35    But as discussed above, before Officer pulled up to the parking stall, Officer had already conducted the records searches,

and those searches showed that the vehicle's owner had multiple arrest warrants. At that point, Officer had reasonable suspicion to detain Anderson for a level two investigatory stop. Because of this, it simply did not matter whether Officer pulled in to the side of Anderson or even directly behind him, because Officer could constitutionally detain him. The evidence in question therefore would not have been exculpatory.

¶36    For these reasons, we conclude that there was no basis for granting a motion to suppress based on the loss or destruction of evidence.

CONCLUSION

¶37    We affirm the district court's denial of Anderson's motion to suppress. Because this was the sole basis on which Anderson challenged his conviction (which, as noted, was entered pursuant to a conditional guilty plea), that conviction is likewise affirmed.

_____