2022 UT App 26

## THE UTAH COURT OF APPEALS

LEGAL TENDER SERVICES PLLC,
Appellant,
*v.*
BANK OF AMERICAN FORK AND JPMORGAN CHASE BANK,
Appellees.

Opinion
No. 20200310-CA
Filed February 25, 2022

Fourth District Court, Provo Department
The Honorable Lynn W. Davis
No. 190400833

Lawrence D. Hilton, Attorney for Appellant

Stephen C. Tingey and Brent D. Wride, Attorneys for
Appellee Bank of American Fork

Douglas P. Farr and Zaven A. Sargsian, Attorneys for
Appellee JPMorgan Chase Bank

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1     Legal Tender Services (LTS) is a vendor for an online gold seller, and LTS also provides escrow services for some of the gold seller's sales. To facilitate these transactions, LTS's customers made payments through an online payment portal that was owned and provided by the Bank of American Fork (BAF). After they did, LTS would send them their purchased gold.

¶2     In 2016, an internet fraudster stole a doctor's personal financial information and used that information to purchase several hundred thousand dollars' worth of gold from LTS. After the theft was belatedly discovered, LTS was left with the losses.

¶3 LTS later sued both BAF and JPMorgan Chase Bank (which was the doctor's bank), claiming that they should have prevented the theft. Of note, LTS raised claims sounding in products liability and negligence. But the district court granted the banks' respective motions for summary judgment and/or to dismiss the claims. Along the way, the court also sanctioned LTS's counsel for filing an overlength motion.

¶4 LTS now appeals those decisions, but we affirm. As explained below, the district court correctly ruled that BAF's online payment portal did not qualify as a "product" for purposes of LTS's products liability claim. It also correctly ruled that LTS's negligence claims against both banks failed as a matter of law. Finally, under the circumstances of this case, the district court did not abuse its discretion when it sanctioned LTS's counsel for filing an overlength motion.

## BACKGROUND[1]

¶5 LTS was a vendor for an online gold seller, and it also provided escrow services for that gold seller. These services included receiving money from various buyers, transferring the

---

1. As noted above, we are reviewing separate decisions that granted motions to dismiss and summary judgment. When reviewing a decision granting a motion to dismiss, "we view the facts pled in the complaint and all reasonable inferences from them in the light most favorable to the plaintiff." *Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶ 4, 356 P.3d 1172 (quotation simplified). When reviewing a decision granting summary judgment, we view "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *JENCO LC v. Perkins Coie LLP*, 2016 UT App 140, ¶ 10, 378 P.3d 131 (quotation simplified). In this case, LTS is both the plaintiff and the party that opposed the summary judgment motion at issue.

buyers' money to the gold seller, facilitating the shipment of the gold to the buyer on behalf of the seller, and transferring the escrow funds to the seller.

¶6    LTS opened an account with BAF and entered into an agreement (the Agreement) to use BAF's automated clearinghouse (ACH) payment portal to receive money from the gold buyers. This portal allowed the buyers to access the ACH, which is "a nationwide network through which depository institutions send each other batches of electronic credit and debit transfers." *Far West Bank v. Robertson*, 2017 UT App 213, ¶ 8 n.7, 406 P.3d 1134 (quotation simplified). In this sense, the ACH acts as a communication line for banks that helps them transfer money to one another virtually, and BAF's payment portal acted as an entryway into that network.

### The Agreement's Terms[2]

¶7    The Agreement described the "Services" and "Processing Service Options" provided by BAF through its online payment portal, explaining in pertinent part that LTS "desired BAF to provide certain payment processing services." "This Service consisted of a Customer Payment Portal . . . offered through BAF's service provider" that "provided the tools to LTS to allow an End User to make a payment or donation to LTS via the Internet."[3]

---

2. For readability, we'll forgo brackets when altering the tense of the Agreement's provisions, and for consistency in this opinion, we'll replace its internal references to "Customer" and "Bank" with "LTS" and "BAF," respectively.

3. As used in the Agreement, the term "End User" referred to "Customer's customers," which, applied here, meant LTS's customers.

¶8    Payments were made when an End User accessed LTS's website and provided the End User's credit card number or bank account information. Each transaction was then "considered to have been transmitted by LTS to the Service Provider." Although the service provider would provide LTS with "a branded website and website link that would enable the End User to perform the web page coding necessary to" make the payments, the Agreement made clear that "[a]ll right, title[,] and interest in and to (a) any and all computer programs, . . . (b) the Service procedures[,] and (c) any and all users guides, instructions[,] and other documentation provided to, or used by, LTS in connection with the Service . . . shall be, and remain, the property of BAF."

¶9    The Agreement further explained that it would be LTS's "responsibility" to ensure "that the origination of ACH transactions complied with U.S. law," as well as to "obtain authorization for each entry prior to debiting [an] End User's account." "With respect to each and every Entry transmitted by LTS and [an] End User, LTS represented and warranted to BAF and agreed that . . . each person shown as the End User on an Entry received by BAF from LTS had authorized the initiation of such Entry and the crediting or debiting of its account."

¶10    Under the Agreement, LTS agreed that it had "the sole responsibility for the accuracy of the data transmitted to [the] Service Provider," and LTS also "acknowledged and agreed that if an inconsistency between an End User's name and account number existed, the transaction would [still] be initiated based upon the account number even if it identified a person different from the named End User." LTS further "agreed to be responsible and liable for any loss incurred by any party" under such circumstances. LTS expressly "acknowledged that it was solely responsible for any and all returned or rejected items," and it further "agreed to indemnify BAF . . . [for] any and all actions taken by End Users as it related to this Agreement, [and] any claim by any End User or other third party that an ACH or credit card entry was not issued by an End User or a person acting on behalf of an End User."

¶11    Regarding security and other safety protocols for the online payment portal, LTS agreed to be "solely responsible for providing for and maintaining the physical, electronic, procedural, administrative, and technical security of data," and it "acknowledged and agreed that it was LTS's responsibility to protect itself and to be vigilant against e-mail fraud, phishing, and other internet frauds and schemes." The Agreement therefore provided that BAF would not be "responsible for any losses, injuries, or harm incurred by LTS or End Users as a result of any electronic, e-mail, or internet fraud."

*The Hack*

¶12    LTS paid a monthly fee for these services, and it used them "without any noteworthy complications" from April 2013 to April 2016. But in May 2016, someone fraudulently representing himself to be a doctor registered with the gold seller using the doctor's correct (albeit stolen) personal identifying information. The fraudster then began purchasing gold in the doctor's name using the doctor's funds, doing so through the doctor's Chase bank account and LTS's online payment portal provided by BAF. These payments each went through the online payment portal, and each registered as "settled" a few days after the fraudster initiated them. On the day after each transaction "settled," LTS facilitated the shipment of gold coins to the addresses provided by the fraudster.

¶13    The fraudster made five separate deposits into LTS's escrow account over a twelve-day period, and LTS sent four separate shipments of gold coins to the fraudster at various addresses across the country. In all, LTS facilitated the shipment of about $420,000 worth of gold coins to the fraudster.

¶14    After the theft was finally discovered, BAF restored the money to the doctor's Chase bank account, thus leaving LTS's escrow account "with a deficit balance" of $420,000.

*The Litigation*

¶15    LTS later sued BAF and Chase, asserting, among other things, that BAF was strictly liable for its "defective product" (i.e., the online payment portal) and that both BAF and Chase were also liable for LTS's loss under negligence principles.

1.    Products Liability

¶16    In its products liability claim, LTS asserted that BAF was strictly liable for the "defective nature" of the online payment portal. LTS faulted BAF for the "utter lack of safeguards," the lack of "limits on transfer amounts," and failing to implement "any other meaningful measures to protect their account holders."

¶17    LTS and later BAF filed competing summary judgment motions regarding the products liability claim. After briefing and argument, the district court granted BAF's motion for summary judgment and denied LTS's motion. The court concluded that "[u]nder the Agreement, [BAF's] software service provider enabled [LTS] to use an ACH customer payment portal by providing the portal through a website," but that BAF "never provided any movable, tangible goods" and "did not provide software or hardware under the Agreement." The court thus concluded that LTS had not "shown that [BAF] provided any 'product[]' for purposes of a strict liability claim." And because "the Agreement put[] the onus on [LTS] to obtain all necessary hardware and software," and because it "expressly state[d] that [BAF would] retain[] any right, title, and interest to any software or documentation that [LTS] obtained pursuant to the Agreement," the court also concluded that no "'sale' or 'license' of any product" took place. The court accordingly concluded that LTS's products liability claim failed and that BAF was "entitled to judgment as a matter of law."

¶18    Alternatively, the court also concluded that, even if "the subject transaction was a hybrid transaction," LTS could not prevail on a products liability claim because "the predominant

purpose of the Agreement was [still] to provide services to [LTS]," not to facilitate a sale of any good or product. It accordingly denied LTS's motion for summary judgment and instead granted summary judgment in BAF's favor on the products liability claim.

## 2. Negligence

¶19 LTS also brought negligence claims against BAF and Chase, asserting that both were negligent for failing to, "among other things, employ all reasonable measures to curtail the unauthorized transfer of their funds to unsuspecting recipients." In response, BAF and Chase each moved to dismiss LTS's negligence claims against them, albeit on different grounds.

¶20 In its motion, BAF argued that LTS's negligence claim against it was barred by the economic loss rule because the injuries LTS complained of arose out of the Agreement. Since the economic loss rule requires that a plaintiff "sue only for contract-based remedies" when the alleged tort arose from "a breach of a duty that the contract itself imposes," BAF argued that "LTS may not assert a tort claim in an effort to circumvent the Agreement." (Quotation simplified.)

¶21 The district court agreed. It determined that "BAF and LTS ha[d] a contract governing the transactions that led to the dispute" and that "[t]here [was] no independent duty alleged by LTS" that would give rise to a separate tort claim. As a result, it held that LTS's negligence claim against BAF was barred by the economic loss rule. The court therefore dismissed that claim.

¶22 In its motion, Chase argued that it owed "no legal duty" to LTS because LTS was "not Chase's customer" and did "not have a contractual or other relationship with Chase." The district court agreed that Chase "owe[d] no duty to LTS." It therefore dismissed LTS's negligence claim against Chase.

3.    Sanctions

¶23    Early in the litigation, LTS filed a motion for summary judgment. In response, Chase moved to strike this motion on two particular grounds that matter here. First, Chase pointed out that a motion for summary judgment must contain a "statement of material facts claimed not to be genuinely disputed" and that each of those facts must be "separately stated in numbered paragraphs." Utah R. Civ. P. 56(a)(1). LTS's motion had not complied with this requirement, however. Instead, LTS had included what it called a "brief review" of the facts, and it then simply "incorporate[d] by reference paragraphs 1 through 60 of [its] Complaint" and "all exhibits authenticated thereby." Second, Chase also invoked rule 7(c) of the Utah Rules of Civil Procedure, which limits summary judgment motions to 25 pages. Chase argued that LTS's motion was overlength because it came in at 29 pages.

¶24    Over LTS's opposition, the district court struck LTS's motion for summary judgment. In doing so, the court ordered that "if [LTS] chooses to refile a motion for summary judgment, and absent an order extending the applicable page limits, the motion must comply with [the] page limitations under Rule 7(c) and content requirements under Rule 56(a), including that it contain a statement of material facts claimed not to be genuinely disputed."

¶25    About a week later, LTS filed a second motion for summary judgment. LTS now included a statement of undisputed facts that complied with the rule's separate-numbering requirement. LTS also noted that its alleged facts were drawn directly from its complaint. (In other words, what it had previously "incorporated by reference," it now included directly.) This fact section was four-pages long, and it was also single-spaced. With the benefit of these four single-spaced pages, LTS's second motion for summary judgment came in at 25 pages.

¶26   Chase moved to strike this second motion. Chase pointed out that under rule 10(d) of the Utah Rules of Civil Procedure, "all text" in a pleading "must be double spaced, except for matters customarily single spaced." Chase argued that "[b]ecause more than 4 pages of LTS's Motion is not double spaced, it blatantly violates Rule 10(d)." Chase further asserted that, "[b]y single spacing more than 4 pages of its Motion," LTS had "avoided compliance with Rule 7" and its "25-page limitation." Chase also requested sanctions, asking the court to require LTS "to pay Chase's legal fees for having to bring two motions to strike."

¶27   LTS opposed this (second) motion to strike its (second) motion for summary judgment, accusing Chase of being "preoccup[ied] with form over substance." With respect to the four-page single-spaced fact section, LTS claimed that this was permissible because it was a "block quote," and block quotes, in LTS's view, "fall within [the] customary exception."

¶28   The district court granted Chase's motion. The court found that LTS's "single spaced" statement of material facts was indeed a violation of rule 10(d) and that LTS had "effectively gained an additional four pages and avoided seeking permission to file overlength" by "single spacing the facts," thus violating rule 7's page limit too. The court further determined that LTS's "violations [were] not minor matters and the rules cannot be avoided when convenient. Rather, such violations prejudice opposing counsel, who is also bound to a page limit and must respond to an overlength motion." "Moreover," the court continued, "this is the second time [LTS] has filed a motion for summary judgment that violate[d] the rules. . . . Rather than address the problems and comply with the limits, [LTS] attempted to bypass the rules through single spacing the facts." (Quotation simplified.) While the court acknowledged that "[i]t is typical for parties to use their previously drafted facts in a motion for summary judgment," it explained that "these are not 'customarily single spaced.'" (Quoting Utah R. Civ. P. 10(d).) The court accordingly struck LTS's motion and awarded Chase "reasonable attorneys' fees related to" Chase's "second motion

to strike [LTS's] motion for summary judgment." (Quotation simplified.)

ISSUES AND STANDARDS OF REVIEW

¶29    On appeal, LTS first argues that the district court erred in granting summary judgment in BAF's favor on its products liability claim. "We review a grant of summary judgment for correctness," giving "no deference to the district court's legal conclusions and consider[ing] whether the court correctly decided that no genuine issue of material fact existed." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 15, 390 P.3d 314 (quotation simplified).

¶30    LTS also challenges the district court's grant of BAF's and Chase's motions to dismiss the negligence claims. "We review a decision granting a motion to dismiss for correctness, granting no deference to the decision of the district court." *Fehr v. Stockton*, 2018 UT App 136, ¶ 8, 427 P.3d 1190 (quotation simplified).

¶31    Finally, LTS challenges the district court's decision to sanction it for filing an overlength motion. "Our review of a district court's imposition of sanctions follows a two-step process," wherein we first "ensure that the district court has made a factual finding that the party's behavior merits sanctions," and we then determine if the district court abused its discretion in issuing the sanction. *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957.

ANALYSIS

I. Products Liability

¶32    LTS challenges the dismissal of its products liability claim against BAF. LTS argues that the district court based its decision on a "false dichotomy" from the Agreement between providing

"*services*" and "furnishing a *product*." (Emphases in original.) According to LTS, the term "service" only denotes a "customized, personalized offering." And because BAF's online payment portal was automated, LTS argues that it can't be a service and instead qualifies as a product under Utah's Product Liability Act. We disagree.

¶33    In Utah, "product[s] liability encompasses all actions seeking money damages for injury to people or property resulting from defective products." *Utah Local Gov't Trust v. Wheeler Mach. Co.*, 2008 UT 84, ¶ 10, 199 P.3d 949. For products liability to apply, "the transaction must concern a product and that product must be defective when it is sold." *Id.* ¶ 11. Because "a service alone cannot be considered a product," *id.* ¶ 16, a threshold question in a products liability claim is whether the item that allegedly failed actually qualifies as a product.

¶34    But "the Product Liability Act does not define product," and for many years "no controlling Utah case law describe[d] a test for defining product" either. *Id.* Recognizing this gap in the law, our supreme court has directed courts to look to the Uniform Commercial Code (UCC) for help when determining if something is a "product" and thus subject to the Product Liability Act. *See id.* ¶¶ 16, 37.

¶35    "[W]hether a transaction involves a product" can therefore "be determined by using the UCC test for determining whether the transaction was for goods." *Id.* ¶ 37. And the UCC defines "goods" as "all things (including specially manufactured goods) which are *movable* at the time of identification to the contract for sale." Utah Code Ann. § 70A-2-105(1) (LexisNexis 2020) (emphasis added); *see also* Restatement (Third) of Torts: Products Liability § 19 (Am. L. Inst. 1998) (defining "product" as "tangible personal property distributed commercially for use or consumption").

¶36    Again, the alleged product at issue here was BAF's online payment portal. Under the principles explained above, we conclude that the district court correctly dismissed LTS's

products liability claim against BAF for two reasons. First, BAF's payment portal is much more of a service than it is a product, given that the portal isn't a movable good. And second, even if the payment portal may have some characteristics of a product, the predominant purpose of the contract between LTS and BAF was for BAF to provide services to LTS, and in such situations there is no viable products liability claim.

¶37     First, the portal isn't a "movable" good, Utah Code Ann. § 70A-2-105(1), nor is it an item of "tangible personal property," Restatement (Third) of Torts: Products Liability § 19. Rather, it's an online portal that is accessed by following the "website link" provided by BAF's "service provider," and no separate "hardware [or] software needed to access the Service" was part of the Agreement between the parties. For this reason alone, it likely does not qualify as a good under the UCC or a product for purposes of a products liability claim.

¶38     Second, even if the Agreement can somehow be said to have involved the sale or lease of a good, the fact that the Agreement was predominantly about "services" requires us to affirm the district court's dismissal of LTS's products liability claim.

¶39     Products liability claims sometimes involve a hybrid transaction—i.e., a transaction in which "both a traditional tangible good sale and a service [are] present in the same transaction." *Utah Local Gov't Trust*, 2008 UT 84, ¶ 16. And hybrid transactions can sometimes be actionable in a products liability claim. But not always. When a hybrid transaction is at issue, a court must "examin[e] the predominant purpose of the transaction" to determine whether the Product Liability Act applies. *Id.* ¶ 37. Under the predominant-purpose test, the court reviews "the factual circumstances surrounding the negotiation, formation[,] and contemplated performance of the contract to determine whether the contract is predominantly or primarily a contract for the sale of goods." *Id*. ¶ 31 (quotation simplified). If the contract was predominantly for the sale of goods, there can

be a products liability claim; but if the contract's predominant purpose was to provide a service, there can't be such a claim.

¶40   Here, the predominant purpose of the Agreement was to provide a service—namely, to have BAF facilitate financial transactions between LTS and its End Users. This is clear from the Agreement itself. The Agreement said, for example, that BAF was providing "payment processing *services*." (Emphasis added.) And it likewise said that this "service" consisted of "a Customer Payment Portal" that "provided the tools to LTS to allow an End User to make a payment or donation to LTS via the Internet."[4]

¶41   Moreover, under the Agreement, LTS had no ownership of the payment portal. Instead, "[a]ll right, title[,] and interest in and to" the service and all its components "remained the property of BAF," and LTS was required to "obtain and maintain at its own expense[] all hardware and software needed to access the Service." Because of this, BAF essentially acted as the middleman for the transactions, and it was ultimately BAF—not LTS—who "processed the credit card transaction or generated an ACH . . . transaction from the bank account information" provided by LTS's customers. In this sense, the predominant purpose of the Agreement was to provide a service, not to sell (or lease) a product (or movable good) to LTS. Thus, even if this Agreement did contemplate a hybrid transaction, it was one in which the predominant purpose was to provide a service, thus pulling it out of the realm of products liability.

---

4. LTS disputes this characterization, arguing that for purposes of this test, the term "service" "connotes a customized, personalized offering." According to LTS, this would not include automated transactions like the one at issue. But LTS points to no authority (and we're aware of none) holding that anything that is automated necessarily qualifies as a product for purposes of products liability law, and we see no reason to create such a rule here.

¶42    In short, the portal in question looks more like a service than a product, and the Agreement predominantly (if not exclusively) involved services. We therefore affirm the district court's decision to grant BAF's request for summary judgment on LTS's products liability claim against it.

## II. Negligence

¶43    LTS next asserts that both BAF and Chase owed it an independent "duty of ordinary care in handling all banking transactions." In LTS's view, both banks breached that duty by failing to perform certain security checks before processing the transactions. The district court, however, (A) dismissed the claim against BAF under the economic loss rule, and (B) dismissed the claim against Chase based on its conclusion that Chase owed no duty to LTS. It was correct on both fronts.

A.    LTS's negligence claim against BAF is barred by the economic loss rule.

¶44    The district court concluded that LTS's negligence claim against BAF was barred by the economic loss rule. LTS now challenges this. LTS cites *Arrow Industries, Inc. v. Zions First National Bank* for the proposition that BAF was "'subject to the general duty owed by *all* banks to act in good faith and exercise ordinary care in handling *all* banking transactions.'" 767 P.2d 935, 937 (Utah 1988) (emphases added by LTS). Because of this (alleged) independent duty, LTS claims that the economic loss rule does not apply.

¶45    We disagree. As explained below, the economic loss rule applies here because (1) the parties' contract covers the allegations at issue in LTS's suit, and (2) BAF did not have an independent statutory duty toward LTS under the framework set forth in *Arrow*.

1.   The parties' contract covers the subject matter of LTS's negligence allegations against BAF.

¶46   "The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 18, 221 P.3d 234 (quotation simplified). This rule "prevents recovery of economic damages under a theory of tort liability when a contract covers the subject matter of the dispute." *Reighard v. Yates*, 2012 UT 45, ¶ 14, 285 P.3d 1168.

¶47   The initial question, then, is whether the Agreement "covers" LTS's allegations against BAF. It does on a number of levels.

¶48   For example, LTS's central claim was that BAF failed to "[e]mploy all reasonable measures to curtail the unauthorized transfer of [its] funds to unsuspecting recipients." But the Agreement provided that "LTS would obtain authorization for each entry prior to debiting End User's account" and that "LTS would utilize commercially reasonable methods to establish the identity of the End User." In the Agreement, LTS further "warranted to BAF that each such End User has authorized LTS to submit ACH Entries to their accounts in settlements of transactions to which End User has agreed."

¶49   In a similar vein, LTS alleged that BAF breached its "duty to protect against, prohibit, and prevent unauthorized, third-party access to financial accounts through proper use of reasonable methods to guard against identity theft or theft of passwords, access codes, or similar information." But in the Agreement, LTS "acknowledged and agreed that it was LTS's responsibility to protect itself and to be vigilant against e-mail fraud, phishing, and other internet frauds and schemes," and LTS "represented and warranted to BAF" that it "agreed that . . .

each person shown as the End User on an Entry received by BAF from LTS has authorized the initiation of such Entry and the crediting or debiting of its account." LTS likewise "agreed to indemnify BAF . . . [from] any claim by any End User or other third party that an ACH or credit card entry was not issued by an End User or a person acting on behalf of an End User."

¶50   LTS further alleged that BAF negligently marked the transactions as "settled" when it had "a duty to refrain from" doing so when the transactions "were supposedly still 'provisional.'" And relatedly, LTS alleged that BAF failed to "promptly advise [the] recipients of such funds" when it discovered "the mistake," as well as "to fully comply with applicable rules, regulations, statutes, and other legal procedures for taking ameliorative action." But the Agreement provided that BAF's "Security Procedures are not designed for the detection of errors" and that "BAF is not, and will not be, obligated to detect errors by LTS or others." LTS also agreed that it "shall be the responsibility of LTS that the origination of ACH transactions complies with U.S. law, . . . and all rules and regulations promulgated by the Federal Trade Commission." And LTS agreed that "BAF has no obligation to discover and shall not be liable to LTS or any End User for errors made by LTS or an End User, including but not limited to errors made in identifying the End User." Moreover, the Agreement set forth remedies for failed transactions, providing that if "any debit Entry is returned to BAF . . . BAF will debit LTS's Account for the amount of the return item plus fees and costs incurred by BAF" and that LTS would be "solely responsible for any and all returned or rejected items."

¶51   These provisions allocate responsibility to LTS—and not to BAF—for the alleged duties and breaches at issue in its negligence claim against BAF. And more importantly for purposes of the economic loss rule, they make it clear that the Agreement at least "covers the subject matter of the dispute"

between LTS and BAF. *Reighard*, 2012 UT 45, ¶ 14. The economic loss rule therefore applies.[5]

2.      The independent duty described in Article 4 of the UCC does not extend to the facts of this case.

¶52    As noted, when one party's allegations against another are "cover[ed]" by the contract between them, "the contract is the exclusive means of obtaining economic recovery" and traditional tort remedies are unavailable. *Id.* ¶¶ 14, 20. When "an independent duty . . . exists apart from the contract," however, a tort claim can escape the economic loss rule. *Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 43, 70 P.3d 1. The economic loss rule therefore does not stop a tort claim when there is "a duty or obligation that is not subsumed by, but exists independent of, the contracts" between the parties. *Id.* ¶ 46; *see also Reighard*, 2012 UT 45, ¶ 21 ("Whether the economic loss rule applies depends on whether a duty exists independent of any contractual obligations between the parties." (Quotation simplified.)).

¶53    Here, LTS argues that "[a]n extra-contractual, independent, statutory duty does indeed exist in this case" under Utah Code section 70A-4-103(1) and *Arrow Industries, Inc. v. Zions First National Bank*, 767 P.2d 935 (Utah 1988). We disagree.

¶54    Our legislature has adopted certain portions of the UCC. *See Butters v. Jackson*, 917 P.2d 87, 90 n.2 (Utah Ct. App. 1996). And in *Arrow*, our supreme court did state that "UCC section 4-

---

5. LTS separately argues that the indemnity provisions in the Agreement are unconscionable because "[a] bank may not contractually disclaim its statutory duty to exercise ordinary care." But since we conclude below that BAF owed no statutory duty to LTS under Article 4, it also follows that the indemnity provisions are not "disclaim[ing]" any statutory duty as LTS alleges. LTS's unconscionability argument thus fails.

103 recognizes a bank's duty to act in good faith and exercise ordinary care in all its dealings." 767 P.2d at 938. LTS relies heavily on *Arrow*'s reference to a duty existing in "all" of a bank's dealings. In LTS's view, this means that an extra-contractual duty existed here.

¶55    But we haven't interpreted this passage from *Arrow* as recognizing a UCC duty that applies to *every* transaction that a bank is ever involved in. In *Ramsey v. Hancock*, 2003 UT App 319, ¶ 15, 79 P.3d 423, for example, we limited *Arrow*'s application to a bank's customers and those parties "contractually related to the bank." Indeed, we held that banks owe no "duty to a noncustomer payee." *Id.* ¶ 20. Other courts have reached the same conclusion. *See, e.g., Eisenberg v. Wachovia Bank, NA*, 301 F.3d 220, 227 (4th Cir. 2002) ("We are persuaded by the reasoning articulated in the numerous cases holding that a bank does not owe noncustomers a duty of care."); *Zero Down Supply Chain Sols., Inc. v. Global Transp. Sols., Inc.*, No. 2:07-CV-400 TC, 2008 WL 4642975, at *12 (D. Utah Oct. 17, 2008) (directing the plaintiffs "to discover and submit evidence regarding their relationship with" the bank before determining whether the bank owed a duty to those plaintiffs); *Shane Smith Enters., Inc. v. Bank of Am., NA*, No. 4:06CV00376, 2007 WL 1880201, at *2 (E.D. Ark. June 29, 2007) ("In cases where a noncustomer asserted a negligence claim against a bank for failing to prevent a customer of the bank from depositing stolen checks, the overwhelming majority of courts have ruled that the bank did not owe a duty of reasonable care to the noncustomer.").

¶56    Moreover, the text from *Arrow* that LTS relies on also suggests that this duty does not apply to all transactions that a bank is ever involved in. As noted, *Arrow* referred to a "duty to act" that comes from "UCC section 4-103." *Arrow*, 767 P.2d at 938. Thus, under this passage, the question is whether the

transactions at issue were actually governed by UCC section 4-103 or even Article 4 at all.[6]

¶57 Looking to other jurisdictions for help, we conclude that they're not. *See Lewiston State Bank v. Greenline Equip., LLC*, 2006 UT App 446, ¶ 15 n.7, 147 P.3d 951 ("Because the Uniform Commercial Code is national in character, case law interpreting it is also national. Consequently, we rely on case law from other jurisdictions to interpret the Code." (Quotation simplified.)); *see also Dale K. Barker Co. PC CPA Profit Sharing Plan v. Turner*, 2021 UT App 119, ¶ 22, 500 P.3d 940.

¶58 Instead, "Article 4 was meant to apply to checks and traditional, written, monetary instruments." *Hospicomm, Inc. v. Fleet Bank, NA*, 338 F. Supp. 2d 578, 586 (E.D. Pa. 2004). But it was "simply not created to govern transactions that are wholly electronic, as opposed to more traditional transactions effected by written instruments." *Harber v. Leader Fed. Bank for Sav.*, 159 S.W.3d 545, 551–52 (Tenn. Ct. App. 2004).

¶59 Courts across the country have long recognized this. As a result, courts have commonly held that electronic fund transfers are not covered by Article 4. The Kansas Supreme Court's decision in *Sinclair Oil Corp. v. Sylvan State Bank*, 869 P.2d 675 (Kan. 1994), is well-reasoned and illustrative. There, the court considered the question of whether Article 4 covered a series of "electronic debits" between a company and a bank. *Id.* at 677. Notably, those debits were exchanged using the "automated

---

6. LTS asserts in its reply brief that the banks "concede[d]" that Article 4 applies to the transactions at issue in this case. We see no such concession. To the contrary, BAF argued in its brief that "the ACH transfers that are at issue in this case are not governed by the UCC, and certainly not by Article 4 of the UCC." BAF further argued that *Arrow* (which LTS relies on to assert this independent duty and which focuses on Article 4) "is inapplicable to these transactions."

clearing house" or "ACH" system, *id.* at 678, which is the system that was used in the transactions at issue in this appeal.

¶60    *Sinclair* held that Article 4 does not apply to "electronic fund transfer debit transactions." *Id.* at 680. Surveying the field, the court could not find "a single case" that had "found that the UCC" applies to electronic fund transfers—all of the cases had said the opposite. *Id.* And the court noted that "[n]umerous commentators" had also "concluded that the UCC does not apply" to such transfers. *Id.*

¶61    *Sinclair* identified three main rationales for the decisions "excluding" electronic fund transfers from "UCC coverage": "(1) electronic debits are not 'items' within the meaning of Article 4; (2) the UCC does not specifically address the problems of electronic fund transfers; and (3) the UCC drafters never contemplated electronic transactions when developing the Code." *Id.* (quotation simplified).

¶62    The court saw these as interrelated rationales, noting that the UCC refers to "items," which "appears to include only writings." *Id.* And the term "writings," in turn, has been codified as including "drafts, checks, certificates of deposit, and notes." *Id.* at 681.

¶63    The court viewed this limited categorization as stemming from Article 4's history. It noted that Article 4 was drafted "in the early 1920s to govern check collection." *Id.* (quotation simplified). After then describing the obvious differences in how written checks are processed versus how electronic transfers are processed, the court concluded that Article 4 was simply not designed or drafted with electronic transactions in mind. *Id.* The court thus declined to bring electronic transactions into Article 4's orbit "[i]n the absence of legislative action." *Id.*

¶64    This same approach was followed, and this same result was reached, in a number of decisions that had been issued before *Sinclair*. *See, e.g.*, *Delbrueck & Co. v. Mfrs. Hanover Trust Co.*, 609 F.2d 1047, 1051 (2d Cir. 1979) ("The [UCC] is not

applicable to this case because the UCC does not specifically address the problems of electronic funds transfer[s].”); *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955 (7th Cir. 1982) (“Maybe the language of Article 4 could be stretched to include electronic fund transfers . . . but they were not in the contemplation of the draftsmen.”); *Walker v. Texas Com. Bank, NA*, 635 F. Supp. 678, 681 (S.D. Tex. 1986) (“Perhaps, the language of Article 4 could be stretched to encompass wire transfers, but such application was not within the contemplation of the draftsmen.”).

¶65 True, *Sinclair* and these decisions were issued before the rise and ubiquity of internet-based financial transactions. But courts have continued to draw the line between “written” and “electronic” transactions in decisions that post-date the development of the modern internet. *See, e.g.*, *Hospicomm, Inc.*, 338 F. Supp. 2d at 586 (holding that “Article 4 does not contemplate electronic withdrawals”); *Baquero v. JP Morgan Chase Bank, NA*, No. 10-23212-CIV, 2010 WL 11553589, at *4 (S.D. Fla. Dec. 22, 2010) (explaining that a “detailed analysis” regarding whether electronic fund transfers are covered by the UCC “is not necessar[y] as every court that has addressed the matter has found that the UCC does not apply to electronic fund transfers”); *Marrow v. Bank of Am., NA*, No. 2491, 2021 WL 2627702, at *11 (Md. Ct. Spec. App. 2021) (concluding that “[n]o provision of Article 4 of Maryland’s Commercial Law Article applies to electronic funds transactions”); *Margolis v. Sandy Spring Bank*, 110 A.3d 784, 790 (Md. Ct. Spec. App. 2015) (concluding that Maryland’s similarly worded Article 4 “does not apply to electronic transactions”). Like *Sinclair*, these internet-era cases have continued to reinforce the key distinction: Article 4 “was meant to apply to checks and traditional, written, monetary instruments,” as opposed to “electronic transfers.” *Hospicomm*, 338 F. Supp. 2d at 585–86.[7]

---

7. Moreover, we note an additional rationale offered by some of these cases: namely, that Congress in 1978 passed the “Electronic

(continued…)

¶66    So here, the question is whether Utah's version of UCC Article 4 covers the kind of transactions at issue in this case. And critically, Utah's Article 4 includes the same textual cues that have led other courts to conclude that Article 4 is inapplicable to electronic fund transfers.

¶67    Like UCC Article 4, Utah's Article 4 largely turns on the existence of an "item." *See* Utah Code Ann. § 70A-4-102 (LexisNexis 2020). On that front, Utah defines the term "item" to "mean an instrument or a promise or order to pay money handled by a bank for collection or payment." *Id.* § 70A-4-104(1)(i); *id.* § 70A-4-104, U.C.C. cmt. 8.

¶68    Consistent with the general UCC approach discussed above, the applicable definitions for "item" and "instrument" depend on the existence of a "writing." The term "instrument," for example, "means a negotiable instrument." *Id.* § 70A-3-104(2); *id.* § 70A-4-104, U.C.C. cmt. 8. And the Utah Code then adopts the UCC's definition of "negotiable instrument" to be "limited to a signed *writing* that orders or promises payment of money." *Id.* § 78A-3-104, U.C.C. cmt. 1 (emphasis added). So too with the terms "promise" and "order." As with "item," Utah's Article 4 defines these terms to refer to "a *written* undertaking to pay money" and "a *written* instruction to pay money," respectively. *Id.* § 70A-4-104, U.C.C. cmt. 8 (emphases added).

---

(…continued)

Fund Transfer Act" (commonly referred to as the EFTA), a statute that, unlike Article 4 of the UCC, *is* designed to "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." *Hospicomm, Inc. v. Fleet Bank, NA*, 338 F. Supp. 2d 578, 586 (E.D. Pa. 2004) (quoting 15 U.S.C. § 1693); *see also Margolis v. Sandy Spring Bank*, 110 A.3d 784, 791 (Md. Ct. Spec. App. 2015). The existence of that separate and more directly applicable law corroborates the conclusion that UCC Article 4 is not applicable to electronic transactions.

¶69    In light of these textual cues, and in light of the broad consensus from other jurisdictions, we see no basis for holding that Article 4 applies to electronic fund transfers, as opposed to traditional written instruments. Given that the transactions at issue were entirely electronic, they therefore were not covered by Article 4. Because of this, LTS cannot rely on Article 4 (or *Arrow*'s discussion of an independent duty arising from Article 4) to assert an independent statutory basis for its negligence claim. And because LTS's negligence claim against BAF was "cover[ed]" by the Agreement, the economic loss rule bars it. *Reighard*, 2012 UT 45, ¶ 14.[8]

---

8. LTS's fifth through eighth claims against BAF were separately based on Article 4a of the UCC. Unlike Article 4, Article 4a applies to "credit transfers," which arguably includes "wire transfers." *See Grand Bayman Belize, Ltd. v. Wells Fargo & Co.*, 514 F. Supp. 3d 1188, 1192 (C.D. Cal. 2021); *Gilbert & Caddy, PA v. JP Morgan Chase Bank, NA*, 193 F. Supp. 3d 1294, 1306 (S.D. Fla. 2016). The district court dismissed those claims, however, concluding that the transactions between LTS and BAF were not "credit transfers," but were instead "debit transfers to which Article 4a does not apply." *See also* Utah Code Ann. § 70A-4a-104, cmt. 4 (explaining that Article 4a's provisions apply to "credit transfers" but "exclude debit transfers").

It's unclear whether LTS means to challenge that decision or to similarly rely on Article 4a as a way of avoiding the economic loss rule. Regardless, we reject any such attempt as being inadequately briefed. Besides calling the district court's categorization of these transactions a "fiction," LTS has not provided any legal authority or detailed analysis showing that either (i) these electronic fund transfers were not debit transfers, or instead (ii) Article 4a would apply to them anyway. Because "Utah appellate courts will not consider claims that are inadequately briefed," *State v. Garner*, 2002 UT App 234, ¶ 8, 52

(continued…)

B.    LTS's negligence claim against Chase fails because LTS was not Chase's customer, and Chase therefore owed it no duty of care.

¶70    With respect to Chase, LTS's argument is that Chase owed it an independent duty of care under Utah's Article 4 and that Chase's failure to take certain security measures violated that duty. The district court disagreed, and we affirm that dismissal for two reasons.

¶71    First, as explained above, Article 4 does not govern electronic fund transfers. LTS's negligence claim against Chase therefore fails for the same reason that its negligence claim against BAF fails: Article 4 does not establish an independent duty for these kinds of transactions.

¶72    Second, the district court also concluded that LTS's negligence claim against Chase was foreclosed by our decision in *Ramsey v. Hancock*, 2003 UT App 319, 79 P.3d 423. We agree with that conclusion.

¶73    In *Ramsey*, we held that, "absent a customer or contractual relationship," banks owe noncustomers no duty. *Id.* ¶ 17. This rule has straightforward application here. Because LTS was not Chase's customer, and because LTS had no contractual relationship with Chase, Chase owed LTS no duty. LTS's negligence claim against Chase thus fails.

¶74    Resisting this, LTS points out that *Ramsey* only considered "whether a *non-payor depository* bank owes a noncustomer a duty of care." *Id.* ¶ 9 (emphasis added by LTS). Since Chase is the payor bank here and not the depository bank, LTS argues that *Ramsey* is inapplicable.

---

(…continued)
P.3d 467, we reject any argument by LTS that attempts to rely on Article 4a as a separate basis for imposing tort liability on BAF.

¶75    But while it's true that *Ramsey* involved a "non-payor depository bank," *id.*, we disagree with LTS's assertion that *Ramsey*'s rule turned on that detail. Rather, we read *Ramsey* as having more broadly held that banks owe no duty to noncustomers. *See id.* ¶ 20. In this sense, what matters is the relationship between the plaintiff and the bank, not whether the bank was on the giving or receiving end of funds. *Cf. Tuttle v. Olds*, 2007 UT App 10, ¶ 14, 155 P.3d 893 (summarizing *Ramsey* as holding that "a bank did not owe a duty of reasonable care to the noncustomer plaintiff whose signature was forged by a third party").

¶76    This reading of *Ramsey* is bolstered by the fact that *Ramsey* itself relied on three other cases that applied this same rule to payor banks, as opposed to depository banks. *See Ramsey*, 2003 UT App 319, ¶¶ 10–11, 14, 18, *relying on* (1) *Anschutz v. Central Nat'l Bank of Columbus*, 112 N.W.2d 545, 550 (Neb. 1961) (reasoning that since "the drawee [or payor] bank has no means of verifying the authenticity of endorsements made by those who are not their customers," it is reasonable to restrict "the bank's liability to the customer with whom it deals"); (2) *Schleicher v. Western State Bank of Devils Lake*, 314 N.W.2d 293, 297 (N.D. 1982) (concluding that the payor bank did not owe a duty "to the payee of a forged check . . . where the payee is not a customer or depositor" of the bank); *and* (3) *Miller-Rogaska, Inc. v. Bank One, Texas, NA*, 931 S.W.2d 655, 664 (Tex. App. 1996) (ruling in favor of both the depository *and* payor banks because the payee "was not a customer of either bank, nor did it have a relationship with either bank"). And it's also bolstered by the wide consensus of other courts that have examined the issue. *See, e.g.*, *Smith v. AmSouth Bank, Inc.*, 892 So. 2d 905, 909 n.2 (Ala. 2004) (collecting cases to support the proposition that "banks owe no duty of care to noncustomers").

¶77    Thus, under *Ramsey*, a bank's duty to act in good faith and exercise ordinary care is not governed by the bank's status as a payor or non-payor bank; rather, it's governed by the non-bank party's status as customer or noncustomer. Since it is undisputed that LTS was not Chase's customer, it follows that Chase owed

no tort-based duty to LTS. And with no duty of care, LTS's negligence claim against Chase was properly dismissed by the district court.

¶78 Still resistant, counsel for LTS asked us during oral argument to "clarify the scope" of *Ramsey* and "overrule it" if necessary to allow LTS's claim to proceed. "Horizontal stare decisis," however, ordinarily "requires that a court of appeals follow its own prior decisions." *State v. Menzies*, 889 P.2d 393, 399 n.3 (Utah 1994), *superseded on other grounds by constitutional amendment*, Utah Const. art. I, § 12, *as recognized in State v. Legg*, 2018 UT 12, ¶ 9, 417 P.3d 592. Nevertheless, "a panel may overrule its own or another panel's decision where the decision is clearly erroneous or conditions have changed so as to render the prior decision inapplicable." *In re C.C.*, 2017 UT App 134, ¶ 26, 402 P.3d 17 (quotation simplified); *see also Christiansen v. Harrison W. Constr. Corp.*, 2021 UT 65, ¶¶ 51–52, 500 P.3d 825 (Lee, A.C.J., concurring) (explaining that "our case law has long endorsed a presumption of deference to past precedent" but that "[t]he presumption, of course, is rebuttable").

¶79 But LTS has not briefed any argument about why *Ramsey* is either "clearly erroneous" on this point or about what "conditions have changed" since it was issued that would make its holding inapplicable here. *In re C.C.*, 2017 UT App 134, ¶ 26. For this reason, we are not in a position to reexamine *Ramsey*'s underlying holding.

¶80 LTS offers a final alternative argument, asserting that there was "a bona fide relationship between LTS and Chase by virtue of the common financial transactions to which they were parties." (Emphasis omitted.) But the fact that Chase and LTS were on either end of a handful of electronic fund transfers does not elevate LTS to the customer-like or contractual-relationship statuses contemplated by *Ramsey*.

¶81 For the foregoing reasons, we affirm the dismissal of LTS's negligence claim against Chase.

III. Sanctions

¶82    Finally, LTS challenges the district court's decision to order it to pay a portion of Chase's attorney fees as a sanction for filing a (second) overlength summary judgment motion.

¶83    "The appropriate standard for reviewing equitable awards of attorney fees is abuse of discretion." *Anderton v. Boren*, 2017 UT App 232, ¶ 14, 414 P.3d 508 (quotation simplified). When we review a challenge to such a decision, we follow "a two-step process." *Raass Bros. Inc. v. Raass*, 2019 UT App 183, ¶ 11, 454 P.3d 83 (quotation simplified). First, we "ensure that the district court has made a factual finding that the party's behavior merits sanctions, and we disturb such findings only if there was no evidentiary basis for the district court's ruling." *Id.* (quotation simplified). "Second, we review the district court's overall sanctions ruling for abuse of discretion, disturbing it only if abuse of discretion is clearly shown." *Id.* (quotation simplified).

¶84    Here, the district court made the requisite factual findings and concluded that sanctions were appropriate. In its order, the court explained that, "[b]y single spacing, [LTS] effectively gained an additional four pages and avoided seeking permission to file overlength, which is a violation" of Utah Rule of Civil Procedure 7(c). It described how "such violations prejudice[d] opposing counsel" by making counsel "respond to an overlength motion" within the prescribed page limits. And the court specifically found that LTS "attempted to bypass the rules through single spacing the facts" rather than "address[ing] the problems and comply[ing] with the [page] limits." In the court's view, this single-spacing was done in contravention of rule 10(d), which requires pleadings to be "double spaced, except for matters customarily single spaced," and this caused the motion as a whole to violate the page limit set forth in rule 7(c).

¶85    We do tend to agree that, in an ordinary case, a party shouldn't be monetarily sanctioned for violating a rule that turns on what is "customarily single spaced." Utah R. Civ. P. 10(d).

The Utah Rules of Civil Procedure don't contain a definitive accounting of what is or isn't "customarily single spaced," so wayward parties should usually be forgiven for good faith violations in this regard.

¶86    But this isn't an ordinary case. Here, the district court had already struck LTS's previous summary judgment motion for violating rule 7(c)'s page-length limitations. And the order that did so specifically warned LTS that, if it chose "to refile a motion for summary judgment, and absent an order extending the applicable page limits, the motion must comply with [the] page limitations under Rule 7(c) and content requirements under Rule 56(a)." LTS was therefore on direct and targeted notice that the court intended to enforce the rules regarding acceptable page lengths against it for any subsequent summary judgment motion. So when LTS then filed a new summary judgment motion that included a four-page single-spaced passage, this suggested that LTS was simply trying to get around the very same rules that the district court had just enforced against it.

¶87    In its brief, LTS responds by asserting (as it did below) that its single-spaced passage was appropriate because it was a "block quote" and "block quotes fall within [the] customary exception." LTS also regards it as significant that its block quote was comprised of "verbatim quotations from the Complaint."

¶88    It's our sense that attorneys do customarily block quote lengthy passages from statutes, contracts, or portions of the record that recount testimony. Less frequently, it's acceptable (though usually stylistically frowned on) for attorneys to block quote lengthy passages from cases.[9]

---

9. *See* Hon. Ruth Bader Ginsburg, *Remarks on Appellate Advocacy*, 50 S. C. L. Rev. 567, 568 (1999) (noting that a "first-rate brief" "skips long quotations," though it "doesn't unfairly crop the occasional quotations used to highlight key points"); Hon. Antonin Scalia & Bryan A. Garner, Making Your Case 128

(continued…)

¶89    Here, however, LTS wasn't faulted for block quoting a passage from a statute, or a contract, or a transcript, nor was it even faulted for block quoting a key quote from a case that was directly on point. Rather, LTS was faulted for block quoting a lengthy passage from its own prior pleading. In other words, LTS was faulted for block quoting itself.

¶90    In our experience, and apparently in the experience of the district court too, parties do not customarily block quote themselves, let alone for several pages. And such a maneuver would be particularly inappropriate if done to get under a page limit, especially where the court had just enforced that same page limit against that party when striking a prior motion on the same subject.[10]

_____

(…continued)
(Thomson/West 2008) (cautioning attorneys to "[b]e especially loath to use a lengthy, indented quotation" because such quotations "invite[] skipping" and are often not "read by anyone").

10. Indeed, at the risk of delving too deep into the weeds on this, it may even be charitable to accept LTS's reference to the offending passage as a "block quote." In legal writing and non-legal writing alike, block quotes are indented on the left, and they're usually indented on the right too. *See The Bluebook: A Uniform System of Citation* R. 5.1(a)(i), at 82 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020) (block quotes "should be indented on the left and right"); Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 1.30(d) (4th ed. 2018) (block quotes should be "[s]et . . . off from the previous text" and "indent[ed]" "on both sides"); *The Chicago Manual of Style* ¶ 13.9 (16th ed. 2010) (block quotes are indented "from the left and sometimes from the right").

(continued…)

¶91    In short, the district court made sufficient "factual finding[s]" to show "that [LTS's] behavior merit[ed] sanctions." *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957. And from there, we defer to the court about whether this conduct merited sanctions, and this deference is warranted because the court was in a better position than we are to judge the culpability of LTS's conduct. *See id.* Given the circumstances at issue, we see no abuse of discretion.

CONCLUSION

¶92    For the foregoing reasons, we affirm the rulings at issue. The district court properly granted summary judgment to BAF on LTS's products liability claim because no product was sold from BAF to LTS, or, alternatively, because the predominant purpose of the transaction was to provide a service. The court properly dismissed LTS's negligence claim against BAF under the economic loss rule because the Agreement covered the subject matter of LTS's negligence claim, and it correctly dismissed LTS's other negligence claim against Chase because Chase did not owe a duty to LTS. And, finally, the district court did not abuse its discretion in granting attorney fees to Chase after LTS filed an overlength motion.

───────────

(…continued)

        LTS's passage wasn't properly indented, however. So in this additional sense, it wasn't really a proper block quote at all, but was instead just a four-page section that LTS single-spaced in order to get under a page limit.